STREET *v.* STATE, 43 Miss. R., 1.

### HOMICIDE.

At common law, the court of king's bench and its judges had the *power* to bail in all felonies, before or after conviction, without regard to the nature of the crime or punishment. But the practice was not to bail where the facts made it highly probable that the accused had committed a felony.

The discretionary power to bail, at common law, was rarely exerted after indictment for a felony, except in special circumstances, arising generally after indictment.[1]

The bill of rights makes bail a matter of *right* for all crimes except capital felonies, where the presumption is great or proof evident. The original of this provision is a clause in the ordinance of 1789, for the government of the territory north of the Ohio

[1] 2 Coke's Inst., 186, *et seq.*; 2 Hale's P. C., 129; 1 Chitty's Cr. Law, 128.

river. From this original it has been copied into most of the state constitutions and statutes.[1]

The courts of many of the states hold the indictment for murder as furnishing the "presumption great," and decline to hear testimony to reduce the grade of the crime from murder to manslaughter.[2]

In this state for many years the practice varied. But since the decision in the case of the State v. Wray, the practice has been to receive testimony *aliunde* the indictment.

On a writ of error in *habeas corpus* proceedings, the supreme court exercises purely a revisory and correctional jurisdiction. The judgment reviewed is presumptively correct, and error must be shown. The supreme court have no larger discretionary power to bail than the court of original jurisdiction.

If the testimony be conflicting, or the credibility of witnesses involved, the appellate court would regard the circuit judge who heard it orally as in the most favorable condition to come to a correct conclusion, and would not disturb his decision.

If the testimony make the impression on the mind of the supreme court that the petit jury would be warranted in a verdict of guilty, the judgment of the circuit judge denying bail would be affirmed.[3]

If the return to this writ is that the relator is in custody, to answer an indictment for murder, lawful authority for the detention is shown;[4] and if no testimony were offered to show a lesser grade of felonious homicide, or that the accused ought not to be convicted of any offense, it would be the duty of the judge to remand.

It is well-settled law that before the acts and declarations of one party can be received in evidence against another, in a criminal prosecution, there must be proof of a conspiracy, *aliunde*. The words themselves do not prove the conspiracy, or tend to prove it; and, therefore, such declarations are mere hearsay. But it is quite as well settled by authority that a "conspiracy may be proved, like other controverted facts, by the acts of parties, or by circumstances, as well as their agreement."

Error to the circuit court of Yazoo county. CUNNINGHAM, J.

Upon application of Street, by *habeas corpus*, to be discharged from custody or admitted to bail, he being confined in jail upon indictment found at January special term, 1870, of Yazoo circuit court, for murder.

In the first count of the indictment, Street and David Roach were indicted as principals; by the second count Street was charged as accessory before the fact; and by the third, as accessory after the fact, of the murder of Benjamin Roach, brother of said David.

Of David's guilt, the evidence admitted of no doubt or dispute, except that possibly his weak and dissolute understanding rendered his legal accountability questionable. But of *Street's*

[1] Const. U. S.

[2] Const. Miss., art. 1, § 17.

[3] Shore and Parkinson's case, 6 Mo., 640; Foley v. People, 1 Breese (Ills.), 32; *ex parte* Campbell, 20 Ala., 80; *ex parte* McCrary, 22 ib., 65; R. M. Charton's R., 120; Antonez v. State, 26 Ala., 81.

[4] *Ex parte* White, 4 Eng., 222; People v. Lohman, 2 Barb., 450; People v. McLeod, 1 Hill, 377.

connection with the affair, there was much conflict in the statements of witnesses.

On the part of the state, he was represented by some of the witnesses as having previously quarrelled with deceased, and threatened to have his revenge; as having given David Roach excessive quantities of whisky on the morning of, and immediately before the killing; as sitting, at the time of the murder, quietly in the yard with others, his friends and associates, some of them his relatives, about forty steps from the house where the murder occurred, in full hearing of the pistol-shot, and of the cries for help, and in full view of the attempt made by one of the witnesses (McDowell) to arrest David Roach; and that Street and his associates kept their seats, with the utmost unconcern, till David Roach, finding himself unable, alone, to resist the arrest, exclaimed to Street, "if you do not come and assist and befriend me, as you promised, I will tell who gave me the pistol," or words to like effect. That thereupon Street came instantly to his assistance, told the witness, who was trying to arrest him, that he had no right to do so without a warrant—that he (Street) wanted to talk to David—that David must take care of himself, and he (Street) did promise to befriend him, &c.; that thereupon Street led David away to his (Street's) horse, which was standing saddled in the yard, mounted him on the horse, and David rode rapidly away; and that the pistol used by David was the property of Street. These facts were sworn to by a white man named McDowell, and sworn to, or corroborated, by several colored persons on the premises.

Street's witnesses were chiefly the persons alleged as above to have been seated with him in the yard, and others of his relations and associates—by whom all the facts and circumstances inculpating him were positively denied. Those present on the premises denied that they had heard the report of the pistol, or any cry of murder, or call for help. They denied that the pistol belonged to Street, but said it belonged to one of Street's witnesses. They denied that Street gave his horse to David, but stated that he took the horse by force, threatening to kill any of them who should attempt to prevent or oppose him.

They stated that Street and the deceased were, and had always been, entirely friendly. Street also proved that David was a person of weak and infirm mind, and that he had frequently, within ten years before, threatened to kill his brother, the deceased.

Such was the substance of the evidence, as brought up in the record.

*Hudson* and *Nye*, for plaintiff in error,

Insisted that the judge below erred in refusing bail in this case. The relator stands indicted in the circuit court of Yazoo county as accessory *before* and *after* the fact of the murder of Benjamin Roach by David Roach, and the question presented is simply one of bail for Street.

If he was accessory *after* the fact, he is, by law and of right, entitled to bail. Rev. Code, 573, art. 3. This statute settles the question; for, whether guilty or not, as accessory *after* the fact, he is clearly entitled to bail.

There remains but a single other question to settle, and that is, whether he was accessory *before the fact*, by "proof evident or presumption great," in the meaning of the constitution as defined by law. See Art. 1, sec. 8, of the Constitution of 1869. And if "the proof is not evident, or the presumption great" that he was accessory *before the fact*, then he is entitled to bail; and that bail must not be excessive; in other words, "must not be unreasonable," as secured by the same provisions of the constitution.

Bail is a matter of right in all cases, even capital, except when the "proof is evident or the presumption great," and forms an exception to the rule, even in capital cases.

It can only be known whether the proof is evident or the presumption is great, of his being an accessory *before the fact* of the homicide of Roach, by hearing the testimony in the case on the part of the state. And yet, in this case the state declined and refused to produce any testimony against the defendant below. In the absence of all testimony on the part of the state, it was the duty of the court below to discharge the defendant. But he was denied bail, denied his discharge, and remanded to prison. The *onus* of proving everything essential

to the establishment of guilt lies on the state.    Starkie on Ev., 436; 11 Pick., 125–132; Wills on Circum. Ev., 183; Wharton's Am. Cr. Law, 347; 4 Blackstone, 552; Wright's R., 617; 5 Blackf., 579; 1 Jones Pa. Rep., 369; 4 Barr, 270; 3 Gillman, 644; Wharton's Am. Cr. Law, 327.

Is the "proof evident or the presumption great" that Street was an accessory *before the fact?* This proof is not mere evidence, with which it is sometimes confounded.    Evidence is not proof, but the medium of proof, while proof is the effect of evidence.    3 Black. Com., 367; 1 Greenl. Ev., § 1; Wills on Circ. Ev., 2; Burr. on Circ. Ev., 1.    "Proof is the perfection of evidence," says an English writer.    Best on Presumptions, § 6; Burr. on Circ. Ev., 182.    ".Proof," derived from the Latin word *probatio,* is used as a word to designate direct evidence in contradistinction to *presumptio, argumentum,* &c.    J. Voet ad Paul, lib. 22, title 3, note 15.    Best on Presumptions, § 4, note.    Evidence is that which *makes clear,* or evident, the the truth of an alleged fact, or which demonstrates, makes clear. or ascertains the truth of a fact or point in issue.    3 Black. Com., 367, and when it rises so high in its power of conviction as to establish the fact in issue beyond every reasonable doubt, then it amounts to proof, and not before.    1 Benth. Jud. Ev., 41; 1 Greenl. Ev., § 13; Burrill on Circ. Ev., 4.    "Presumption great," Burrill on Circ. Ev., 10.

The term "presumption," as employed in *law,* means the arriving at the truth of a disputed fact.    It is the essential principle of circumstantial evidence, and known as *judicial presumption.*    Burrill on Cir. Ev., 41; 3 Bl. Com., 371; 3 Phil. Ev. (Cow. & Hill's notes), note, 286; Burrill on Cir. Ev., 60, 61, 62, 63, 64, 65.    It must establish the fact beyond every reasonable doubt.    Best on Presumptions, § 30; 3 Benth. Jud. Ev., 236, 237.    "Presumption great" means the same force as "proof evident" does before bail can be denied.

2. The existence of a conspiracy must be proven by competent testimony.    The admissions of one conspirator is incompetent as against others; the criminal combination must be proven by *evidence aliunde* (30 Miss., 656; 36 Miss., 617), before such admissions or confessions can be admitted.    1 Greenl.

Ev., § 111; 2 Starkie Ev., 327; Wharton Am. Crim. Law, 261, 262; 30 Miss., 656; 36 Miss., 617. Such acts and declarations must have been *made during the criminal enterprise* and *pending,* and *before its completion or abandonment,* or they are not a part of the *res gestæ,* and cannot be admitted as evidence. 1 Phil. Ev., 200; 1 Greenl. Ev., § 111–280–233; Roscoe Crim. Ev., 80; 2 Starkie Ev., 326; Wharton Am. Crim. Law, 161, 162; 30 Miss., 656; 36 Miss., 617; Roscoe Crim. Ev., 49, 50–77; 1 Hawk. R., 442; 10 Pick., 447–497; 1 Dev., 259; 4 Car. & Payne, 387; 4 ib., 570; 2 Phil. Ev. (Cow. & Hill's notes), 238.

By the Constitution, Art. I, § 8, the policy and the law that must guide courts in determining the right of bail is fully announced. The accused, in all cases not capital, shall have bail, and in cases capital they shall also have bail, except where the "proof is evident or the presumption great;" and even in such cases, they shall have bail if a doubt of guilt arises. J. R. Wray, *ex parte,* 30 Miss., 673. Bail may be granted before conviction, even where the proof is evident and the presumption great. 30 Miss., 673. If there is reason to doubt that the accused conspired with David Roach, or if there is a reasonable doubt whether the homicide was murder, then bail ought to be granted. 3 Greenl. Ev., § 29, Wray, *ex parte,* 30 Miss., 673; 1 Starkie Ev., 478; 1 Hale P. C., 300; 6 Georgia, 276; and see, especially, opinion of Ch. J. in Dr. Webster's case, 5 Cushing, 320, as to question of "proof evident," "presumption great," or "reasonable doubt." Moore v. State, 36 Miss., 137; Beall v. State, 30 Miss., 715; Wray, *ex parte,* 30 Miss., 673.

The action of the United States courts on this subject is in harmony with the state courts, as is shown by the admitting of Jefferson Davis to bail.

No matter how strong or violent the probabilities raised by the evidence against the accused may be, yet if they do not rise to the degree of "proof evident" of his guilt, he is entitled to bail, and if he were upon trial before a jury, would be entitled to an acquittal. Commonwealth v. Webster, 5 Cushing, 320; Browning v. State, 30 Miss., 656; Algheri v. State, 25 Miss., 584. As to the application of circumstantial evidence, see 25

Miss., 584; 3 Greenl. Ev., 31; 1 Starkie Ev., 572; 5 Cushing, 320–296–313–317–319; 5 Blackf., 579; 2 Hale, P. C., 290.

To prove the accused an accessory *before the fact*, it should be shown that he instigated and incited the principal to commit the crime. 3 Greenl. Ev., § 50; also, Rex v. Cruise, 8 Car. & Payne, 541; Whar. Am. Cr. Law, 114; Rex v. White, Russ. & Ry. C. C., 99; Rex v. Mayer, 1 Leach, 314; 1 Hale, P. C., 439; Foster P. C., 350; Whar. Am. Cr. Law, 113; Rex v. Davis, Russ. & Ry. C. C., 113; Rex v. Else, Russ. & Ry. C. C., 142; Hales' Sum., 216; 2 Hawk. P. C., 28, § 10. See, also, 30 Miss., 673.

After the fatal blow was given by David Roach, all that was said or done by him, or by the accused, ceases to have any bearing against the latter as accessory *before the fact*, or on the question of his right to bail. 1 Phil. Ev., 200; 1 Greenl., §§ 111–233–280; Roscoe's Cr. Ev., 49, 50–77–80; 2 Starkie Ev., 326; Whart. Am. Cr. Law, 161, 162; 1 Hawk. R., 442; 11 Pick., 447–497; 1 Dev., 259; 4 Car. & Payne, 387; 4 ib., 570; 2 Phil. Ev. (Cow. & Hill's notes), 238; 30 Miss., 656; 36 Miss., 617. See also, 1 Greenl. Ev., § 197; ib., 200; 17 Mass. R., 27; 3 Esp., 60; 3 Sumner, 435–438, 439; 11 Verm. R., 138.

Lastly, the accused had no motive, interest, or advantage in the death of the deceased, or in the escape, life, liberty, or concerns of David Roach. 11 Wheaton R., 51; 4 Bl. Com., 160; 5 Yerger R., 459; Inst. Nat. Law Book, 1 C., 16.

*Wilkinson & Bowman*, on the same side.

The plaintiff is charged as accessory before the fact, and as principal with David Roach, in the murder of his brother, Benjamin Roach. By the paramount law of the land, he is entitled to bail, unless the proof is evident, or the presumption great. Constitution, Art. I, § 8.

Proof evident is direct, certain, clear, and conclusive evidence of a fact, without the aid of intervening facts, and needs no special inference to make it appear. Proof is not evident if it is conflicting. Burrill on Cr. Ev., 4; 1 Greenl. Ev., § 13; 5 Cushing's R., 520. To constitute the accused accessory before the fact, he must have instigated, counseled, aided, or com-

manded the act.  3 Greenl. Ev., § 50; 1 Whar. Am. Cr. Law, § 134.

When the fact cannot be demonstratively evinced, that which comes nearest to it is the proof of such circumstances as necessarily or usually attend the fact; these are called violent presumptions, and sometimes equal to full proof; those circumstances appearing which necessarily attend the fact.  3 Bl. Com., 371; 3 Phil. Ev. (Cow. & Hill's notes), 286; Russell on Cr., 60–65.

Assuming everything true which the evidence tends to prove, yet if there is any other reasonable hypothesis than that of the guilt of the accused, arising from the whole testimony, it is insufficient.  Algheri v. State, 25 Miss., 584; John v. State, 24 Miss., 569.

The only grounds upon which the declarations of the party are competent against another, is where there is a conspiracy, and that must be established by evidence *aliunde.*  Browning v. State, 30 Miss., 656; Lynes v. State, 36 Miss., 625; Roscoe's Cr. Ev., 77; 1 Greenl. Ev., § 3; 2 Starkie Ev., 327.

The acts and declarations of a party to a conspiracy must have been made during the criminal enterprise, or pending, or before its completion or abandonment, or else, being no part of the *res gestæ*, they cannot be admitted as evidence against a confederate.  Lynes v. State, 36 Miss., 625; Roscoe's Cr. Ev., 77; Greenl. Ev., §§ 11–28–283.

This court has decided that where it is doubtful whether the offense is murder or manslaughter, the party is entitled to bail. The proof evident or presumption great, must be of the taking of the life of a human being with malice aforethought.  *Ex parte* Wray, 30 Miss., 678.

If there be any doubt as to the guilt of the plaintiff in error, he is entitled to bail.  Bail will be granted even where a jury might, and perhaps ought, to find a party guilty of murder. Wray, *ex parte*, cited above.  Moore v. State, 36 Miss., 142; Beall v. State, 39 Miss., 720.  See also Revised Code, art. 3, 573.

*J. S. Morris,* attorney general,

Submitted an oral argument, in which he attempted to show:

1st. That the principle of the decisions of the High Court of Errors and Appeals in the cases of Wray, Moore, and Beall,[1] are frequently misapplied, and perverted by counsel in applications for bail in capital cases.  It is true that the language used in those cases is to the effect that the court may sometimes grant bail " when a jury might, and perhaps ought to, find the accused guilty of murder "—language which, if accepted literally and in the mere abstract, might operate to admit to bail any murderer. however atrocious his crime, and however evident the proof.

But, he submitted, the language should not be so accepted; on the contrary, it should be carefully construed in the light of all the other theories and principles of criminal jurisprudence applicable to questions of this kind.  So construed, the meaning of all these cases is, simply, that the court would not prejudge the question of a prisoner's guilt, nor the grade of his crime, but leave those questions, in all their bearings, open and free to investigation and solution by the petit jury, which shall ultimately try him upon the indictment and evidence.  It is as much as to say that the judgment of no court—not even the court of last resort—upon the question of bail, is to have any weight whatever with a jury upon the final question of guilty or not guilty.  Though bail shall be refused, the legal presumption of innocence shall still accompany the prisoner to his final trial before a jury of his peers, and he shall not be prejudiced there by a refusal of bail.  And though bail shall be granted, that circumstance shall afford no additional presumption of innocence.  The accused must still be tried on the indictment, and by the law and evidence, and his case decided without any possible reference to the circumstance of his having been admitted to bail.  Regarding in this clear light the language used by the court in these three cases, they are entirely reconcilable to, and in harmony with, the general current of authority on this subject throughout all the states.  And the high character and acknowledged learning of our old High Court, and of the judges of which it was always composed, forbids the conclusion that they meant or intended anything else.

[1] See 30 Miss., 681; 26 ib., 142; 39 ib., 720.

And thus construed, the words used in the cases cited leave this and every other question of bail in a capital case, to depend entirely, as it must, under our own and all other American constitutions, upon the evident character of the proof, or if there be no evident proof, then, upon the magnitude of the presumptions. By adopting this construction of the language used by the court in those cases, we shall find, after all that has been said and supposed to the contrary, that the High Court were really guided, not by the novel fancies and liberal innovations which have been attributed to it, but by the same venerable, familiar, and revered principles of law which have been generally adopted and followed from time immemorial by all the courts of appellate jurisdiction in this country.

2d. If the language of our old High Court shall be construed as meaning in reality all that counsel for the plaintiff in error have claimed in argument, then it is high time for the subject to undergo revision and readjudication.

Though at common law, according to Lord Coke (2 Inst., p. 186, *et seq.*), and Lord Hale (2 Pl. C., p. 129), the court of king's bench, in the exercise of its almost boundless discretion, might bail in any case whatsoever, even in cases of high treason or murder, because the court was held in law *coram ipso rege;* yet the practice was not to admit to bail in any case of felony where there was a strong probability of guilt.

But in the United States the accused has a constitutional right to bail in all "*except* in capital cases when the proof is evident or the presumption great."

The character of cases in which, as a class, bail shall be allowed, is thus fully and explicitly described, and separated from the class in which bail shall not be allowed. *Expressio unius est exclusio alterius,* is a maxim of law, as well as of logic, and is precisely applicable to a correct interpretation of this constitutional provision.

In this case, the return of the sheriff to the writ of *habeas corpus,* the truth of which was not denied, showed that the prisoner was held to answer an indictment for murder. This fact alone renders this " a capital case," and has frequently been held as furnishing the " presumption great," which precludes

admission to bail. 1 Morris' R., 407; 1 Mart. (La.), 142; 8 Barb., 158; 1 Park. Cr. R., 191; 3 W. C. C. R., 224; 2 Dev. (N. C.), 421. In South Carolina, justices who admitted to bail a person charged with murder, for so doing were held guilty of an escape. State v. Arthur, 1 McMullin, 456.

The circuit judge might, therefore, with perfect propriety, have refused to look further into the facts of this case than the mere indictment for murder, and have rendered a decision refusing bail upon the mere uncontradicted return of the sheriff. But, through favor to the accused, all the evidence was retaken, and upon that evidence bail was refused. The disinterested and impartial witnesses who testified on the part of the state, and the *interested* and *partial* witnesses, who, for the most part, were either *related to, or intimately associated with the accused,* and testify *for him,* were all examined and cross-examined by or in the presence of the judge; he heard their words and saw their manner. And for these reasons his judgment should not be disturbed by a tribunal having no such advantages for estimating the value of their testimony, unless it shall appear from the record that manifest error has occurred.

But it is insisted, and we cheerfully admit, that the mere statements and confessions of one of several alleged co-conspirators, considered in the abstract as such statements or confessions, are not sufficient proof against the others to establish their guilt; but that there must be other proof. 1 Greenl. Ev., § 111. But this can have no application here, because there is ample proof that there was a *quarrel* and a *cause* of quarrel between the prisoner and the deceased *before the killing,* and that the prisoner had several times given vent and expression to the malicious feelings of his heart against the deceased by threats of " revenge " against him for taking the plantation from the prisoner and " *renting it to d——d niggers.*" He had refused and persisted in the refusal to get off the place, or to take his effects away, telling his associates and his colored mistress that he should remain on the place till he should obtain his " revenge ;" and in pursuance of this design, he was, in fact, still remaining on the place, with his gang of friends and relations (who are now his *witnesses !*),

when the cup of his revenge was filled by the death of his
enemy.

> "If we do but watch the hour,
> There never yet was human power
> That could evade, if unforgiven,
> The patient search and vigil long
> Of him who treasures up a wrong!"

3d. It is in proof that David Roach, the drunken and imbe-
cile brother of the deceased, whose hand perpetrated the act,
had been plentifully plied with *whisky*, which had been ob-
tained and brought to the place through the efforts and at the
expense of Street; having accomplished which, and having pro-
vided Street's horse for David's immediate flight, and David be-
ing now armed with Street's derringer, and in a proper frame of
mind for the fratricidal act, and all things being now ready,
this prisoner and the balance of his party seated *themselves*
in the front yard, at the distance of only a few steps, and
calmly awaited the result. The fatal shot is fired, and Benja-
min Roach's blood and brains fall upon the newspaper which
he was reading as he sat by his own fireside! David is in-
stantly caught by the witness McDowell, attempting to arrest
him, and raising the cry of "*murder! help!*" etc. David re-
sists and struggles towards his friends, who are still sitting, all
unmoved, at their post of duty in the front yard. On the front
gallery, finding himself unable without assistance to make the
arrest, McDowell distinctly and repeatedly *calls again for help*,
and informs Street and his party that *David had murdered his
brother*. But this appeal and this information, like the report
of the pistol, and like the first cries of murder in the house, fall
on stony ears. They all keep their seats, more calm and uncon-
cerned, perhaps, than Street's horse, standing saddled and
hitched at the gate. But mark! *David*, drunk and imbecile
though he had been only a moment before, shall utter one sen-
tence, and its effect shall be electrical. That sentence is,
"Street, if you do not come and help me as you *promised*, I
will tell *who gave me the pistol!*" That sentence is uttered,
and instantly Street is by his side! McDowell is pushed away,
and informed that he has "no right to make the arrest without
a warrant;" that *he* (Street) "is David's friend, and wants to

talk to him;" that he "*did* promise to befriend him, and will do so;" and that "David must take care of himself," &c., &c.

The tragical scene thus enacted cannot be disposed of by any rule, or by all the rules, applicable to the statements or confessions of one conspirator against his confederates. *Both* the two principal conspirators were here present, *speaking together, and acting together*, and by a concert of words and actions proving plainer than mere words can ever do, their jointly-concerted design, and their equal and united guilt. Had the words of David Roach been spoken at another and subsequent time, when Street was not present, and when his mind, if indeed he had any, had had time to concoct a story for his own exculpation, or the crimination of Street, those words would have been comparatively idle and insignificant, unless the state could have proved by evidence, *aliunde*, the existence of the conspiracy. In that case, the well-recognized rule invoked by learned counsel would have applied. But uttered as they were, at the time and place of the main fact, they were a part of the transaction itself. They are of the *res gestæ*—verbal acts—which are not only admissible, but essential to be known, because connected with the main fact, and explaining its character. 1 Greenl. Ev., §§ 108–111.

The mere words of David Roach, regarded as the vehicle of information of what *he* knew or wished to say to those who heard him, are unimportant; but regarded in their connection with the instant and involuntary *action of Street*, they acquire the utmost significance. Ingenious counsel may explain, at least by conjecture, the words of Roach; but even conjecture returns on weary wing from its search for an explanation in the realms of human reason for the conduct of Street—except that of a conspiracy.

A profound and elegant writer, quoted by both Wills and Burrill in their treatises upon circumstantial evidence, says:

"All the acts of a party, all things that explain or throw light on those acts; all the acts of others, relative to the affair, that come to his knowledge or may influence him; his friendships and enmities; his promises, his threats; the truth of his discourses; the falsehood of his apologies, pretenses and explanations; his looks, his speech, his silence where he is called to

speak; everything which tends to establish the connection between all these particulars; every circumstance, precedent, concomitant and subsequent, become parts of circumstantial evidence."[1]

Applying these suggestions to the concurrent language and conduct of these two men in the presence of this tragical crime, we ask why, if not because of his guilt, was Street silent or acquiescent to the intimation that he had furnished David Roach with the pistol? Why was he not defiant *then*, as he had been with the deceased, when he quarrelled with him about the corn, and threatened to have revenge? Why did he not challenge David Roach to make good his threat, and " *tell* where he got the pistol?" Why did he not deny *then*, as he does now, having "promised to befriend" David Roach? When the report of the pistol, and the cry of "murder!" and the struggle of McDowell with David Roach, and the loud and repeated calls for "help!" had failed, utterly, to disturb the composure of Sweet and his friends seated in the yard, why was it that David Roach's threats to expose the conspiracy caused Street to come instantly and resolutely to *his assistance?*

Upon the hypothesis of Street's innocence, his own actions, his words, and even his silence, on this occasion, are strange, mysterious, irrational and totally inexplicable, upon any of the principles or motives which ordinarily control and regulate the conduct of mankind. But, upon the hypothesis of a previously concerted agreement between David Roach *and Street* that the former should do the deed with the latter's pistol, and that the latter should then and thereafter "befriend him," all doubt and difficulty and mystery at once vanish, and the whole affair stands fully explained and reconcilable to the ordinary laws of human conduct.

4th. And if this conspiracy did exist, of what crime is the relator in this proceeding guilty? The answer is *of murder*—or, what is the same thing by the laws of this state—of being the preliminary *instigator* of, and *accessory* to, murder, *before the fact*—which, like the crime of his principal—or, more

[1] 2 Burke's Works, 613.

properly, in this case, of his *agent*, is punishable with death. Rev. Code of 1857, p. 572, art. 2.

This would be the grade of the offense and its penalty by our statute, if we assume that David Roach *was sane*. But if we assume, according to the tendency of some of the evidence for the relator, that David Roach was *insane*, either from mental disease or from the whisky administered by Street; then, so far as Street is concerned, there may be this technical distinction: Roach, being insane, may, for that reason, be excused from all criminal responsibility; and Street, instead of being punishable with death as an accessory before the fact, is punishable with death as *principal*.

Upon this point I refer the court to an authority from Kelyng's Reports, 52, cited by the attorney-general in the case of the Commonwealth v. Bowen, 13 Mass., 356: "Memorandum, that my brother *Twisden*, showed me a report which he had of a charge given by Justice *Jones* to the grand jury at the king's bench barre, Michaelmas Term, 9 Car. 1, in which he said that poisoning another was murder at common law. And the statute of 1 Ed. 6, was but declaratory of the common law, and an affirmation of it. If one drinks poison by the provocation of another, and dieth of it, this is murder in the person that persuaded it. And he took this difference: If A give poison to J S to give to J P, and J S knowing it to be poison, give it to J P, who taketh it in the absence of J S and dieth of it: in this case J S, who gave it to J P, is principal, and A, who gave the poison to J S, and was absent when it was taken, is but accessory before the fact. But if A layeth poison for J S, and J S, in the absence of A, taketh it and dieth of it: in this case, A, though he be absent, yet he is principal. So it is, if A giveth poison to B to give unto C, and B, not knowing it to be poison, but believing it to be a good medicine, giveth it to C, who dieth of it: in this case, A, who is absent, is principal; or else a man should be murdered, and there should be no principal. For B, who knoweth nothing of the poison, is in no fault, though he gave it to C. So if A puts a sword into the hands of a *madman*, and bids him kill B with it, and then A goeth away, and the madman kills B with the sword, as A commanded

him, this is murder in A, though absent, and he ·is principal: for it is no crime in the madman, who did the fact by reason of his madness."

And again: "A principal in the first degree is one who is the actor or actual perpetrator of the fact. But it is not necessary that he should have committed the act with his own hands, or be actually present when the offense is committed; for if one lay poison purposely for another who takes it, and is killed, he who laid the poison, though absent when it was taken, is a principal in the first degree. If he acts through the medium of an innocent or *insane* person, he is guilty as principal. Thus, in Sir William Courtney's case, Lord Denman, C. J., charged the jury: 'You will say whether you find that Courtney was a dangerous or mischievous person; that these two prisoners knew he was so, and yet kept with him, aiding and abetting him with their presence, and conferring in his acts; and if you do, you will find them guilty, for they are liable as principals for what was done by his hand? If the principal were insane when the act was committed, no one could be convicted as an aider or abettor. If a child under the age of discretion, or any other instrument, excused from responsibility for his actions by *defect of understanding*, ignorance of the fact or other cause, be incited to the commission of murder or any other crime, the incitor, though absent when the fact was committed, is, *ex necessitate*, liable for the act of his agent, and a principal in the first degree.'" Whar. Am. Cr. L. (6th ed.), § 112; and numerous English and American cases there cited.

On behalf of the state, we therefore confidently submit that the present is a "capital case," in which "the proof *is* evident" *and* "the presumption great." And if so, or, if the court shall· consider that the proof is *not* "evident," but that "the presumption" of guilt *is* "great," we submit that the character of the crime is one of such exceeding and unparalleled atrocity as to forbid that this prisoner should be turned loose upon bail. And, upon the question of bail in such cases, the attorney-general read and made the application of the following authorities:

State v. Blackfellow, 1 Halst. (N. J.), 332; Foley v. People,

1 Breese (Ill.), 32; State v. Hill, 3 Brevard (S. C.), 89; State
v. Howell, R. M. Charlton's (Ga.) R., 120; State v. Wicks, ib.,
139; Comm. v. Keeper, &c., 2 Ashmead (Pa.), 227; Shore v.
State, 6 Mo., 640; *ex parte* Tayleo, 5 Cow. (N. Y.), 39; State
v. Summons, 19 Ohio, 139.

In the cases cited from Ohio and Pennsylvania, it is laid
down as a safe rule, *" to refuse bail in all cases where a judge
would sustain a capital conviction if pronounced by a jury
upon the same evidence.."* 2 Ashm., 227; 19 Ohio, 139.

SIMRALL, J.:

The sheriff returned on the writ, that he held the relator in
custody under arrest by bench warrant, to answer an indict-
ment for murder.

The defendant rested his case, and moved for discharge upon
or without bail; but the court refused to discharge or bail,
which is assigned for error. The return of the sheriff not being
controverted, as might have been done under Art. 11, of *habeas
corpus* act, it showed sufficient authority to hold the prisoner in
custody.

The indictment was then read, and the testimony of the
witnesses taken. During the trial several questions as to ad-
missibility and competency of testimony were made to the effect
that the declarations and statements of David Roach, the actual
perpetrator of the homicide, were not admissible in evidence
against the relator, because there had not been proof made that
the relator had conspired and confederated with Roach to kill
the deceased.

It is well settled law, that before the acts and declarations
of one party can be received in evidence against the other,
there must be proof of a conspiracy, *aliunde*. The words them-
selves do not prove the confederacy or tend to prove it; and,
therefore, such declarations are mere hearsay. But it is quite
as well settled by authority that a " conspiracy may be proved,
like other controverted facts, by the acts of parties or by
circumstances as well as their agreement."

In this case the declarations objected to were made in the
presence and hearing of the relator—some of them addressed to

him—and are, therefore, relieved of the objection made by the counsel; and were competent on other grounds, altogether, as tending, with other things, to make out the conspiracy.

That the judgment which we render in this case may be the better understood, we will attempt to state the principles of the law of bail as at common law, in England and the United States, and as modified by our constitution and statutes. By the early English common law, bail seems to have been a matter of discretion with all judicial magistrates and courts before whom offenders might be brought. By the ancient statute of Westminster—1 C., 13, especially—the power to bail, as to the inferior courts and magistrates, was regulated and restricted; but the court of king's bench and its judges were left unaffected by this statute, in possession of full common law jurisdiction. The celebrated *habeas corpus* act of Charles II, conferred the power to bail on the judges of the superior courts of Westminster Hall, and other superior judges. In those states of the Union which have derived their jurisprudence from the English source, this common law jurisdiction has been held to pertain to the superior courts, and has been very generally delegated by statute to the judges of the higher courts. The primary object of the great writ of *habeas corpus* was to deliver persons restrained of their liberty without any or sufficient legal cause and authority; therefore, the respondent to the writ was required, in the fullest manner, to return the caption, its date and the cause or authority of the detention, and the court, or judge, according to the circumstances of the case, either discharged, bailed, or remanded.

The court of king's bench and the judges authorized to hear and determine a case on *habeas corpus* have, according to the principles of the common law, the power and discretion to bail all persons whatsoever, and for all offenses whatsoever, without regard to the degree of the crime, or the nature of the punishment. Their power to bail in a capital case was as unquestioned as when the punishment did not reach to the life of the accused. The power and the discretion being thus co-extensive, and their exercise discretionary, it is important to look to the practice and the principles on which the courts and judges pro-

ceeded. The rule as laid down by Hawkins, b. 2, chap. 15, §§ 20 and 80, is, " that persons convicted of felony, or who have confessed their guilt, or are notoriously guilty of treason or manslaughter, by their own confession or otherwise, are not to be admitted to bail without some special motive to induce the court to grant it, for bail is only proper where it stands indifferent whether the party is guilty or innocent of the accusation against him, as it often does before the trial; but when that indifference is removed it would be absurd to bail."

In Rex v. Dyer, 2 C. & P., 77, the application to bail was on the ground that the offense imputed was not a felony; but the court being of the opinion that it was a felony, bail was refused. So in Rex v. Marks, 3 East, 163, it appearing from the depositions taken before the coroner's jury that the crime charged was felony, the prisoner was remanded.

The court refuses to receive extrinsic evidence, confining itself to the return, and the depositions before the committing magistrate or the coroner. If the return be legally sufficient, the court cannot try the fact on affidavit, nor can the return be pleaded to, nor can an issue be made upon it. 1 Bacon Abr., title Bail, 589; 4 S. & R., 757; 4 Burr., 2530; 1 Chitt. Crim. Law, —; 1 Hawk. P. C., chap. 15.

In Tayloe's case, 5 Cowen, the relator was under indictment for manslaughter, which was not a capital felony. The supreme court of New York had the same discretionary power to bail as the king's bench in England. The three judges delivered their opinions, *seriatim*, and the subject of bail as to the power, the right, and the practice, was very thoroughly considered on the authorities. The conclusion reached was, that in felonies bail would not be granted before indictment, unless in special circumstances; among others, the probable innocence of the accused; and such was stated to be the practice from a review of the decisions and accredited text-writers. After indictment the accused ought not to be bailed. The finding of the grand jury is taken as furnishing a strong presumption or probability of guilt. Other considerations will influence the discretion of the court, as when the prosecution has been unreasonably delayed, or the life of the person is endangered by

some distemper or sickness threatening life, which has been induced by the confinement.  1 Bacon Abr., 589.

The right to bail, as it stood at common law, was considered by our predecessors in the case of *ex parte* Dyson, 25 Miss. Rep., 359.  In the very sound and judicious opinion of the court, after stating that the constitutional provision, art. 1, sec. 17, only applied to bail before conviction, and that after conviction the right of the prisoner remained as at common law, while declaring the power as plenary, it added: "While the power is admitted, it should be exercised with great caution, and only when the peculiar circumstances of the case render it right. and proper."  "The court is governed entirely by a sound judicial discretion."  "There must be some special motive to induce the court to grant bail."  Dyson had been convicted of a felony not capital, and his case was pending in the high court awaiting a re-argument.  Under the *habeas corpus* act of Charles II, the judges would not look into testimony, *aliunde*, but regarded the finding of the grand jury as conclusive upon them.

The writ of *habeas corpus* is in nature of a writ of error, to examine into the legality of the imprisonment, and, therefore, it commands the caption and cause of detention to be returned. If the relator was in custody by commitment of a justice of the peace or other inferior magistrate, the custom was to send with the writ a *certiorari* to send up the depositions on which the commitment was predicated.  If there was no pretense of imputing to the prisoner an indictable offense, he will be discharged.  But it is more usual to bail or remand, according to the nature of the charge.  I Chit. Crim. Law, 111-128.

As already stated, the king's bench and its judges have power to bail for any offense whatever before or after conviction.  But this is not a wild, irresponsible discretion, left to the caprice or individual judgment of each judge; but a *legal* discretion, regulated by the rules and practice as contained and expounded in the adjudged cases.  1 Chit. Cr. L., 128.  As said by Ch. Justice Marshall, "regulated according to the usages of law."

In the case of Bennoit, 1 Martin La. Rep., 142, the prisoner had been indicted for an assault with intent to kill and murder,

—then a capital offense. In response to a motion to let to bail, the court said:

"Bail is never allowed in offenses punishable with death, where the proof is evident, and the presumption great."

On a coroner's inquest finding a party guilty of murder, the judges have often looked into the testimony which the coroner is bound to record, and when they have been of opinion that the jury have drawn an illogical conclusion, admitted the party to bail. "But the judges cannot help considering the finding of the grand jury as too great a presumption of the defendant's guilt to bail him."

In Burr's case (by Robinson 1, 301–308), after indictment, application was made for bail. Marshall, C. J., after considerable discussion, said: "The act of Congress, in express terms, enabled the court to bail a person arrested for treason. There was no distinction between treason and other criminal cases, as to the power to bail upon arrests; but an arrest might be after the finding of a grand jury, in which case the finding of the grand jury would be the evidence on which the court would have to judge whether the party arrested ought to be bailed. They were to exercise their discretion according to the nature and circumstances of the offense, and of the evidence, and *usages of the law.* The usages of law were to be found in the common law and the practice of the courts." But he "doubted extremely whether the court had the right to bail after indictment for treason." Mr. Burr and Luther Martin asked for time to search for precedents. No authorities were produced by them, and bail was denied.

In McLeod's case, 25 Wend. Rep., the prisoner was indicted for murder. Bail was refused. The court declined to receive proof of an *alibi* by the relator, at the time of the murder.

Ch. Jus. Raymond, in Rex v. Dalton, 2 Str., 911, thought the indictment conclusive.

State v. Miller, 2 Dev. N. C., 421, Ruffin, J., said: "After indictment found, a defendant is presumed guilty for most, if not all purposes, except that of a fair and impartial trial before a jury. This presumption is so strong that, in a capital felony, the party cannot be let to bail."

Hight v. United States, 1 Morris' (Iowa) Rep., 407, commenting on the effect of an indictment, under a statute forbidding bail in a capital case, "where the presumption is great, or the proof evident," the court said: "An indictment furnishes no presumption when upon trial; but so far as regards all intermediate proceedings between the indictment and trial, it furnishes the very strongest possible presumption of guilt. The finding of the grand jury is conclusive so far as to control proceedings up to the time of trial. The humanity of our law requires, before a person shall be punished as a criminal, he must be found guilty by two independent juries. The verdict of the first raises a full presumption of guilt up to the time of trial before the second."

We will now examine the modifications made by positive law in this state.

The 10th art. of *habeas corpus* act, Code, 366, directs the judges to proceed to inquire into the cause of imprisonment or detention, and may either discharge, bail, or remand, as the law and the evidence may require.

The return shall not be conclusive as to facts therein stated, but evidence may be received to contradict the same.

The return in this case is, that the prisoner is held to answer an indictment for murder. We have seen that, at the common law, on such returns made to the court of king's bench, or to an American court of superior common law jurisdiction, although their right to bail, in any case, and for any offense, without regard to the degree of the crime, or the severity of the punishment, was plenary. Yet the "usages of the law" had so shaped and regulated the discretion of the courts, that, generally, bail was denied after indictment for a felony, unless some special motive was shown, though the felony was not capitally punished; and that in capital cases, the motive or reason for bail must arise in point of time after indictment, such as the delay by the prosecution to bring on the trial, the danger to the life of the accused, occasioned by the imprisonment, &c., &c.

At common law, the return of the sheriff on the writ would not be disputed, and the court looked to that to judge of the rightfulness of the detention.

By the 11th art. of our act, the return may be disputed by evidence. Again, the judge before whom the prisoner is brought shall immediately proceed and dispose of the case according to the law and the evidence; and may summon witnesses, &c., &c.

The writ "extends to all cases of illegal confinement or detention whatever." Its primary object is to deliver from "illegal confinement." Where the return shows, as in this case, that the prisoner was arrested by a bench warrant, which commanded the sheriff to "take and safely keep the relator," to answer an indictment for murder, the "detention" was perfectly legal. Where the prisoner is in confinement, charged by indictment with a capital felony, his petition for the writ, instead of stating, as in this case, that his imprisonment is illegal and without warrant of law, ought to claim that he is entitled to be enlarged on bail, under the section in the bill of rights; for no one would pretend that the judge can discharge, even on the clearest proof of *innocence*.

The practice of the courts and judges, under the *habeas corpus* act of Charles II, and of the American courts and judges, where the common law was not modified, was to remand to custody, where the return showed that the prisoner was under indictment for a capital crime, and they would not hear affidavits or witnesses in exculpation.

The 8th section of the bill of rights introduces a material modification. It makes bailable all crimes (which the common law did not, as a matter of right), "except capital offenses, where the proof is evident or the presumption great."

In Davis' case, 6 How., Miss. Rep., 403, it was remarked by the court: "It is believed that the clause of the constitution was intended by its framers for the better security of the citizen against an improper exercise of discretion with which the common law clothed the judges, and to take from them all discretion whatever, before conviction—only when it becomes necessary to discriminate between capital and minor offenses"—"leaving the discretion after conviction, as at common law."

Under the bill of rights, bail before conviction is a matter of right (and not of discretion) for all offenses, except those

that are capital, "where the proof is evident or presumption great."

Perhaps the original of the section in our bill of rights, and in the constitutions of nearly all the states, is a clause in the ordinance of 1787 for the government of the territory northwest of the river Ohio. This ordinance was mainly prepared by Mr. Jefferson, it is said. The words of the ordinance are: "All persons shall be bailable, unless for capital offenses, where the proof shall be evident or the presumption great." As that territory was formed into states, this provision in the ordinance was, in terms or with slight modifications, incorporated into their constitutions, and for many years has held a place in the constitutions or statutes of nearly all the states. In 1845 the supreme court of Iowa passed on the effect of the ordinance, which had been incorporated into their constitution. It was contended in the case of Hight (1 Morris Rep., 407), who was under indictment for murder, that "liberty be given him to prove and satisfy the court that the charge in the indictment was not based 'upon proof that was evident and presumption great,' and, therefore, he should be let to bail." For the state it was contended that "the indictment furnishes such proof or presumption, and that evidence behind the indictment ought not to be received." It was held by the court that the indictment was conclusive, that no evidence ought to be received; and the application was overruled. The chief justice said: "This is no new provision, but is in express terms incorporated into the constitution of at least half the states, and is the rule of action in all the rest. If the construction contended for be correct, it is a little remarkable that no case can be found where a similar application has been successfully made."

The bill of rights and the statute of our state are not broader or more liberal than in the other states. The *right* continues until conviction.

Until the decision in Wray's case, 30 Miss. Rep., 681, the practice in this state is believed not to have been uniform. In some of the circuits the judges held the indictment for a capital felony as raising conclusively the "presumption great," and declined to examine witnesses.

Since Wray's case, the practice has become uniform, and evidence, *aliunde*, the indictment is received, and this has been considered as settled. On the hearing of the *habeas corpus*, is the indictment placed entirely out of consideration? If so, it becomes a question of guilty or not guilty, on the evidence. Yet it is quite certain that is not the issue; for it were absurd to say that the judge could discharge, however clear the proof of innocence might be. Nor is it in any sense a review or revisal of the grounds of the action of the grand jury, for the judge cannot revise their finding, or put the party on final trial for a less grade of crime.

On the hearing in this case, the issue submitted to the judge was, "Is the presumption great, or the proof evident, that the prisoner is guilty of a capital crime?" The indictment and the testimony were all to be considered in forming a judgment.

When closely reflected on, very serious embarrassments attend the decision of a case brought from the judgment of the circuit judge, where the case turns mainly on the testimony. We feel it sensibly in this case. Nearly every case that we have examined in the English and American books (except those in this state) were *original* applications for bail. In nearly all of them, where the point was referred to at all, the judges declined to go into an analysis of the evidence, to determine as to guilt or innocence. That, say they, "is the province of the jury."

Any discussion we might make, or any opinion we might come to on the subject, might have an injurious effect on the jury trial.

"So much depends on the manner of witnesses, their seeming bias or fairness, that cannot be brought before this court," "which should yet have a material bearing on the weight of evidence," that we would pause long before we would disturb the decisions of the circuit judge, where the weight of the evidence depended on the credibility of witnesses—for he had far, very far, better means of detecting the false, biased, prevaricating witness, than this court—means, indeed, which by the secondary channel of a bill of exceptions, cannot be brought before this court.

We are exercising over this writ of error a purely revisory,

correctional jurisdiction. We have no larger jurisdiction, or discretion to bail—where a case is before us on a writ of error— than the judge or court whose judgment is before us. Indeed, there is nothing in the law to warrant us in dealing with such a case, in any sense, exceptional. We must regard this judgment as presumptively right, until error is shown.

It appears in this case that the witnesses were, in important particulars, conflicting, if not contradictory; that necessarily the question of credibility arose—and assuming that question as settled in the mind of the judge in one way—there are very strong inculpating facts. Touching these matters, the circuit judge had far better opportunities, and was in more favorable circumstances to come to a safe, reliable, and just opinion, than this court.

The grand jury, who had the advantage of a personal examination of the witnesses, *ex parte* to be sure, have charged the party with murder. The circuit judge, with the like examination of such witnesses as were brought before him, has denied bail.

The facts in the record do not raise the question of the degree of the crime—murder or manslaughter. On that subject there can be no doubt. And as manslaughter is included in an indictment for murder—and a conviction of the lesser offense can be sustained under a charge of the greater—there might be great propriety in this court looking at testimony with the view of ascertaining what grade of crime the evidence fixes.

We suppose the main object of allowing a review at all, was to correct the errors of law which might materially prejudice the relator, rather than to estimate and criticise the testimony as to its weight and criminating effects. If the circuit judge excludes testimony material to the defense; if he has clearly mistaken the grade of the felonious homicide to the disadvantage of the prisoner; if he holds a party restrained by arbitrary power, or by private force, or by the sentence or order of a tribunal without jurisdiction; or if he refuses bail on testimony too weak to raise " great presumption, or evident proof "—for the correction of such errors as these, the revisory powers of this court were, in our view, mainly conferred.

"What is meant by the words "proof evident or presumption great?" The judges, as the authorities which we have examined show, were accustomed to look at the depositions before the coroner, or magistrate, to see whether there was probable felony committed by the accused. If he was clearly innocent, they discharged—but if strongly inculpated, they generally refused bail.

After indictment, however, they declined altogether any examination into the *corpus delicti*, accepting the finding of the indictment as strong probability of guilt.

Therefore, in Burr's case, after indictment, bail was denied; therefore, in Bennoit's case, the supreme court of Louisiana declared that the indictment raised the "presumption great;" therefore, in Hight's case, the supreme court of Iowa, attached the same effect to the indictment. It was because the probability of guilt was heightened, by indictment, beyond what it was by the *mittimus* of a justice of the peace, that bail was denied in Tayloe's case, 5 Cowen, and McLeod's case, 25 Wend.

' If on the hearing of this case, neither the prosecution nor defense had offered testimony, what would have been the duty of the judge? Bail, or remand? To discharge was absurd and impossible. There can be hardly doubt that this prisoner must be remanded; for the reason that the matter of the return creates the "presumption great," meant by the bill of rights. The return then contained ample authority to hold the relator in custody, unless its force were broken—the *prima facie* case it made, overcome by the testimony.

We are not left entirely to the results of our own reflections on this point. There is much force in the words of the Pennsylvania court, in the case of Commonwealth v. Keeper of Prison, 1 Ashmead, 234. The Pennsylvania constitution contained precisely the provisions of the section of our bill of rights: "All prisoners shall be bailable, unless for capital felonies where the proof is evident, 'or the presumption great.'" The judge said: "Assuming murder in the second degree to be a bailable offense, yet the power to discriminate and decide upon the degrees of murder pertain to the jury which tries the offender, and is not properly exercisable by the judge, on the

question of admitting to bail. In a given case, where a malicious homicide should be clearly shown, and in which the presumption was reasonably strong to take away life, I should pause before I would undertake to decide as to what degree of murder the perpetrator was guilty of, in such an inquiry as that before me. It is difficult to lay down any precise rule for judicial government in such case; but it would seem a safe one to refuse bail in a case of malicious homicide, *where the judge would sustain a capital conviction pronounced by a jury on evidence of guilt, such as that produced on the application for bail,* and to allow bail where the prosecutor's evidence was of less efficiency. This affords a *practical test* by which the granting or *refusing bail* may be *readily solved.*"

These views are referred to with approbation by the supreme court of Ohio in case of State v. Simmons, 19 Ohio Rep., 141; and the court proceeds: " So with us in Ohio, if the evidence exhibited on the hearing of the application to admit be of so weak a character that it would not sustain a verdict of guilty against a motion for a new trial, the court will feel it their duty, under the constitution, to bail the prisoner." The article in the Ohio constitution is precisely like ours. In this case there had been a disagreement of the jury on one trial, and that circumstance was an element in the case. If the testimony should make the impression on our minds that the petit jury might and ought to convict, on the same testimony, we would not hesitate to declare that the circuit judge did not err in declining to bail.

In Lumm v. State, 3 Porter (Indiana R.), 393, the application was after an indictment for murder. The relator in his petition admitted the legality of his arrest and detention; but claimed that his offense was less than murder, and bailable. The court on their statutes allowed an examination of witnesses, for the reason that " the indictment is not conclusive of the grade of the offense; the prisoner may be convicted of murder in the first or in the second degree; or of manslaughter." (The last two not capital.) The prosecuting officer very often prefers but one count for murder, when the crime intended to be imputed is murder in the second degree, or manslaughter.

After indictment, on *habeas corpus*, the only possible inquiry can be as to the grade of the offense, or the strength of the evidence. It is not a question of guilt or innocence absolutely —for there is no power to discharge. But if on the testimony there is no doubt that a murder has been committed (and no point can, therefore, arise as to the grade), but the issue is as to the guilty complicity of the relator with the perpetrator—and that issue depends in a great degree on the credibility of wit-nesses—it would be going very far in the appellate court to reverse the judgment of the court, who saw, heard, and observed the witnesses. That, as it seems to us, is the case made by this record of the facts.

In the case of Wray, 30 Miss. Rep., 142, and Beall's case, 39 Miss. Rep., 720, the court deemed it "proper to withhold the grounds of its opinion, as the cases were to undergo a jury trial, whose province it was to determine the guilt or innocence of the accused." In these cases the only question that could arise, was as to the grade of the homicide, or its sufficiency to criminate at all—and we are left to inference as to the opinion of the court on the point. Appreciating the delicacy of arguing on the testimony in advance of the jury trial, as to its criminating or exculpatory effect, we have only attempted to deduce from the practice and precedents of the courts, the principles of law on this subject, which have conducted us to the conclusion that, in the circumstances of this case, we ought to affirm the judg-ment of the circuit judge.

Judgment affirmed.

NOTE.—The Reporter learns by a note from one of the learned counsel for Street, that he has been finally acquitted of this charge by a jury of Yazoo county.