No. 2135.

Ex parte Tom Smith, Jr.

1. Habeas Corpus for Bail—Practice—Burden of Proof.—In a habeas corpus proceeding for bail after the presentment of an indictment for a capital offense, it is incumbent on the applicant to show that he is entitled to bail. In his application for the writ of habeas corpus he must allege under oath that he "is illegally restrained in his liberty," and, as this allegation is an affirmative one, and the applicant the actor or plaintiff, the burden is upon him to maintain it in the proof. He can not rest his right to bail upon the presumption of innocence, inasmuch as the issue of which he has assumed the affirmative is determinable by the proof alone, regardless of the presumption of innocence. In his trial upon the indictment, of course the presumption of innocence obtains in favor of the accused, and, the State being then the actor or plaintiff, and holding the affirmative of the issue of guilty or not guilty, the burden of proof on that issue is upon the State. Note the collocation in the opinion of the court of adjudicated cases maintaining this ruling, and the citations from the Bill of Rights and the Code of Procedure impliedly sanctioning it. (Hurt, J., dissents.)

2. Same—Test of the Right to Bail—"Proof Evident"—Case Overruled.—In this case the court renounces the ruling in Foster's case, 5 Texas Court of Appeals, 625, to the effect that bail should be refused in a capital case if the judge would sustain a capital conviction found by a jury upon such evidence as that adduced before him. A better test is that announced in McAnally's case, 53 Alabama, 495, viz: "If the evidence is clear and strong, leading a well guarded and dispassionate judgment to the conclusion that the offense has been committed, that the accused is the guilty agent, and that he will probably be punished capitally if the law be administered, bail is not a matter of right."

3. Same—Conflict of Evidence.—From the fact that there is a conflict of evidence in a habeas corpus trial for bail, it does not necessarily follow that the inculpatory evidence fails to make the proof "evident"; for it is not all exculpatory evidence that will destroy or impair that which is inculpatory, or which will raise a reasonable doubt of the guilt of the applicant for bail. The evidence is to be considered in its entirety, and if, when so considered, a reasonable doubt of the applicant's guilt of a capital offense is not engendered, the "proof is evident," and bail should be refused.

4. Practice in the Court of Appeals.—The trial court admitted certain inculpatory evidence which this court considers inadmissible because it was res inter alios acta, but, instead of reversing the judgment on that account, this court excludes the objectionable evidence from consideration, and upon the legal evidence affirms the judgment refusing bail.

5. SEE THE DISSENTING OPINION OF HURT, JUDGE, controverting the rul-
ing formulated in the first headnote, and maintaining that the general
rule favors the right to bail in all cases except capital cases in which the
"proof is evident,"—that in cases of this character the State stands on
the exception and must establish it,—that the true issue is whether or
not the "proof is evident" that the applicant is guilty of a capital of-
fense, and of this issue the State has the affirmative and the burden of
proof;—that the indictment, even if its allegations proved anything, can
have no bearing upon this issue, inasmuch as it does not allege that the
"proof is evident" of the capital offense charged;—that the presumption
of innocence avails the accused in this as well as on his trial upon the in-
dictment;—and, therefore, that the applicant is entitled to bail unless
the State shows, by evident proof, that he is guilty of the capital offense
charged against him.    Note the dissenting opinion *in extenso* for an ex-
haustive discussion of these positions and of those announced in the
opinion rendered by a majority of the court.
6. FACT CASE.—See the statement of the case for evidence on which it is
*held* that the court below did not err i   disallowing bail to an applicant
charged by indictment with murder in the first degree.   (Hurt, J., dis-
senting.)

APPEAL from the District Court of Travis.    Tried below before
the Hon. A. S. Walker.

This was the second application for bail made by the applicant,
Tom Smith, Jr., who was under indictment for the murder of
Israel Clemons on October 29, 1886.    The indictment charged
murder upon malice aforethought, and perpetrated by shooting
the said Clemons with a pistol.

Applicant was a young man associated in the management of
the Raymond House, a hotel situated on Congress avenue, in the
city of Austin.    Clemons, the deceased, drove a one horse spring
wagon for hire on the streets.    Late in the afternoon of October
29, 1886, an altercation arose between applicant and the deceased,
at the Raymond House, about a trunk, for which the deceased
said he had been sent by the owner.    Applicant would not let
the deceased take the trunk, but sent it to its destination by the
transfer wagon.    About seven o'clock the same evening, the de-
ceased came up the avenue in his spring wagon, passed in front
of and a short distance beyond the Raymond House, when he
was met by the applicant, who came from the direction of the
Raymond House.    According to testimony for the State, the ap-
plicant said, "I've got you now;" but according to testimony for
the applicant, the expression was, "D—n you, I've got you," and
was made by the deceased after he stopped his wagon and just

as he jumped out of it on the side to which the applicant had approached. The most material conflict in the evidence seems to be as to the respective attitudes of the parties at the moment of the fatal shot. There was testimony for the State that it was fired while the deceased was in the act .of getting out of his spring wagon immediately after meeting the applicant; and, on the other hand, there was testimony for the applicant that it was not fired until blows passed between the parties. Applicant is a young man of less than average stature, and the deceased a muscular man, about five feet ten inches in height.

According to the record, the State took the initiative in the evidence, and first introduced the indictment presented by the grand jury of Travis county, on November 19, 1886, whereby it was charged that the applicant, "Tom Smith, Jr., in said county and State, on or about the twenty-ninth day of October, in the year of our Lord eighteen hundred and eighty-six, did with malice aforethought kill Israel Clemons by shooting him with a pistol, against the peace and dignity of the State." Next the State introduced the capias issued upon said indictment, and the sheriff's return thereof, showing the arrest of the applicant on the same day as that on which the indictment was presented.

The State here closed.

The applicant commenced by introducing the evidence taken and reduced to writing at the examining trial held by a justice of the peace of Travis county. The testimony of West Stewart (who at said examining trial was a witness for the State) is the first in order. He testified that he lived in Austin, Travis county, and knew Israel Clemons, now dead, and also Tom Smith, Jr., the defendant, whom he identified and pointed out in court. In the evening of October 29, 1886, about seven o'clock, the witness saw the said Smith on Congress avenue, in Austin, about the middle of the street car track and opposite Newman & Co.'s dry goods store. He was bare headed and had a pistol in his hands. Clemons, the deceased, was standing in the street, and was between Newman's dry goods store and said Smith, and was facing said Smith. When Smith fired the pistol he was nine or ten feet from the deceased, who, in his shirt sleeves and with nothing in his hands, was retreating backwards, though facing Smith. Witness was within about twelve feet of the defendant when the latter fired the shot, but heard neither defendant nor deceased say anything at the time of the shooting. Witness saw the defendant and the deceased about a minute before the shooting

He had stopped in the street near them, and saw no one else in the street at the time. If others were near, they were on the side walk. The street lamps were burning brightly, and also an electric light on the east side of the avenue. Deceased stood still immediately after defendant fired the pistol. Witness spoke up and asked "what in the devil is the matter?" Deceased, recognizing witness's voice, said: "Cousin West, come here; I'm shot." At that time sheriff Hornsby rode up on a brown horse, leaned over on his horse and put his arms around defendant. Witness saw the defendant put his pistol in the inside pocket of either his coat or his vest. Witness did not hear the defendant speak a word. Witness, when called by the deceased, went to him immediately and asked him where he was hit, when he replied that he did not know, but thought he was hit in his leg and arm. He said the defendant shot him, and on witness asking him why Smith shot him, he stated that it was because a gentleman had sent him up after a trunk. Witness asked him what he said to Smith, and he replied: "We got into a squabble over the trunk. Mr. Smith said he would knock me over the head. I replied to Smith that he would not do it if we were out in the country" (or "on the ground"—witness could not remember which). Witness then asked deceased what he was doing out in the middle of the street, and he replied that Mr. Smith stopped him, but did not say what for. About that time Mr. Lucy, the city marshal, walked up and asked the deceased who shot, and deceased replied, "Mr. Smith." Deceased then told witness to carry him home, and witness carried him by Doctor Swearingen's, and thence on home. The pistol in the defendant's hand at the time of the shooting was either a new or a nickel plated pistol.

The cross examination of this witness (made in the examining court by the defendant) developed the fact that he was the driver of a hack, and was on his way to the railroad depot to get some passengers when he found the defendant and the deceased on the avenue, as he had stated in his testimony in chief. He was going south at a rapid gait, on the east side of the street car track. He saw defendant and the deceased a few minutes before he got to them, and he stopped on the curve of the track in front of Simon's saloon. Deceased's wagon was on the west side of the track, and deceased, when first seen by the witness, was on the avenue where it crosses Pine (Fifth) street. He was on the ground in front of his horse, and was nearer to

Newman's store than to the Raymond house. When first seen by witness he was backing towards the foot bridge, and defendant was standing still, east of and about five feet from the deceased. Witness checked up his team when he saw the pistol. He did not hear a word from either the defendant or the deceased. He saw the pistol before the defendant fired; it looked like a new or a nickel plated pistol. Defendant did not move until Hornsby came up. Witness did not see Hornsby when he rode up, but did see him before he, witness, got to the deceased. Nor did witness notice from what direction Hornsby came, but his horse's head was pointed north. Defendant, deceased and witness were the only persons on the street when the shot was fired, and witness saw no one on the sidewalk at that time.

The testimony of G. W. Bright, a State's witness at the examining court, was next introduced by the applicant. Witness lived in Austin and knew the deceased, Israel Clemons. In the evening of October 29, 1886, witness saw Clemons at the International railroad depot in Austin. Witness knew of a difficulty between defendant, Smith, and the deceased. A boy named Strawder came to the depot looking for the transfer man to carry a trunk from the Raymond House to the depot. The owner of the trunk said to the boy: "Is my trunk here yet?" and the boy answered "No, I can't find the transfer man." Clemons, the deceased, stepped to the owner of the trunk and said: "Mister, let me go and get the trunk." The owner replied "Yes, d—n it, go quick." Deceased started to his wagon to go after the trunk. John, the driver of the omnibus, started in the transfer wagon, and went to the Raymond House after the trunk. Deceased returned from the hotel and told witness that Tom (the applicant) would not let him have the trunk. After the train came in, the deceased got into his wagon and started up the avenue, and witness got in his wagon and drove along about fifty feet behind the deceased. As the deceased got beyond the Raymond House, witness saw Mr. Smith making his way on the street and towards the deceased, and heard him say something to the deceased, who then stopped. At that time somebody at the Raymond House hallooed, and witness checked his horse and looked back to see what was wanted there, and then he looked up the avenue again to where he had seen Smith, and heard the report of a pistol and saw the flash. Witness's horse got frightened, and witness directed his attention to

the horse, and, turning around, he went down the avenue a piece. Turning then and reaching the place where the shooting was, the witness saw Mr. Hornsby and Mr. Smith, and then went and tied his horse in front of Simon's saloon. He then went to where the deceased was, and deceased was put into a carriage. The flash of the pistol came from where Smith was standing. Witness was at that time in front of the center of the Raymond House, and west of the street car track. Smith was standing near the deceased and on the east side of the car track where the avenue crosses Pine street. Witness could not say how far Smith was from the deceased when the pistol was fired, though he then saw Smith plainly by the light of an electric lamp in a bar room of the Raymond House. Witness at first saw no one on the street but Smith and the deceased. When he approached the corner where he hitched his horse, he saw Sheriff Hornsby and Smith standing together on the avenue. Before the shot was fired, he heard Smith say something to the deceased, but what it was the witness did not know. As he came back up the avenue he heard West Stewart ask "what the devil is the matter?" and the deceased answered "I'm shot." Witness heard nothing else, and could not say whether the deceased was in his wagon or on the ground when the shot was fired.

On his cross examination the witness said that when he first saw Smith on the occasion in question, the latter was moving in a line apparently from the sidewalk at the upper corner of the Raymond House and in the direction of Newman's store. Deceased was on the seat of his express wagon. Witness saw no one between himself and the deceased as they passed up the avenue. If the deceased said anything to Smith, the witness did not hear it. When Smith spoke to deceased, the latter stopped, and just then the witness heard some one at the Raymond House halloo, but could not say who it was or what he said. Witness did not see the deceased get off of his wagon. The last time witness noticed the deceased before the shot was fired, the deceased was on his wagon, and the next time the witness saw him was after the shot was fired and when he was being put in the carriage. Witness repeated that he did not know whether the deceased was in his wagon or on the ground when the shot was fired. Witness recognized deceased's voice when the latter replied to West Stewart that he was shot.

The testimony of Strawther Shackleford at the examining

trial (when he was a State's witness) was next put in evidence by the applicant. He stated that he lived in Austin and knew both the defendant Smith and the deceased Clemons. In the evening of October 29, 1886, witness saw the deceased at the railroad depot, and also at the Raymond House. Defendant and deceased had a difficulty that evening about a trunk. Witness was sent to the depot by Johnnie Alexander, clerk at the Raymond House, to get the baggage wagon to come there for two trunks. Witness could not find the driver of the baggage wagon at the depot, and called him several times without getting a reply. Some one said he had gone to supper, and witness remarked that there were two trunks at the Raymond House to come down to the depot. The driver of the omnibus then left his vehicle, got in the transfer wagon, and started to the hotel for the trunks. Just then the owner of one of the trunks asked witness, "where in the h—ll is my trunk?" Witness replied that he supposed it was at the hotel, as he had just been sent down for the wagon to go up and get a couple of trunks. The owner then said, "By G—d, I ordered that trunk sent down here an hour ago, and it is not here." Clemons, the deceased, then stepped up and told the owner of the trunk that he would go and get it for him. The owner replied, "Hurry on and get it; I want to make this train." Deceased and the transfer wagon both started for the trunk about the same time. Witness got on the transfer wagon, and the transfer wagon got to the Raymond House and was backing up to the sidewalk when the deceased drove up alongside of the sidewalk. Deceased jumped out of his wagon on to the sidewalk, and took hold of the largest trunk and rolled it down to where his wagon stood. The man driving the transfer wagon asked witness: "Why in the h—ll did you come after both of us to get these trunks?" Witness replied: "I didn't come after both of you; I came after the baggage wagon. A gentleman, the owner of one of these trunks, sen₀ Israel (the deceased) after it." Tom Smith, jr., then came out and told the deceased to "give that trunk to the transfer wagon." Deceased replied: "Pshaw, Mr. Smith, I think I am entitled to that trunk; the gentleman, the owner of it, sent me for it." Smith said: "Well, that's all right; we sent for the transfer company to come and get it." Deceased said: "The transfer company is slow; the gentleman said he thought he was going to get left." Smith then said: "Well, that's all right; we told him we would send it down; so let the transfer company

have it." Deceased turned his head and said: "By George, I don't think that is right." Witness then went to the depot with the transfer wagon and both the trunks, leaving the deceased and Smith standing in front of the Raymond House. In about five minutes the deceased came to the depot and said to witness: "Smith and I liked to have had a squabble after you left." Witness said, "You?" Deceased replied, "Yes." Witness asked him what Smith said, and he replied: "Well, he got to talking about what he could do and what he would do, and I told him I would go anywhere with him and show him what a negro could do with a white man of his size. When I said that a lot of gentlemen who were sitting in front of the hotel laughed at what I said to Smith." Deceased added that Smith then went into the hotel and behind the office counter and opened the register. Some one present at this conversation between witness and deceased said to the latter: "Oh, Israel; you didn't tell him that," and the deceased replied: "Yes, I did." Some one said: "Well, if you did, it was after Smith was gone." Deceased replied: "Well, I can prove it by Mr. Swayne."

Applicant next introduced the testimony given by Perry Scott at the examining trial, where he was a witness for the State. The witness lived in Austin and knew both of the parties to the homicide. Late in the evening of October 29, 1886, as he was coming down the avenue, on the west sidewalk, he noticed the deceased driving up the avenue in a spring wagon. Deceased stopped his spring wagon on the west side of the street car tracks, just opposite the curve made by the track which turns east on Pine street. Witness thought that the deceased's wagon, when stopped, had just passed the north line of Pine street, where the latter crosses the avenue. Witness was then passing in front of the store immediately north of Newman's dry goods store. At that same time the applicant, Smith, was coming from the direction of the Raymond House, and towards the deceased, and had nearly reached the deceased when the witness saw him. The next thing noticed by witness was the applicant striking at the deceased and the latter dodging. Deceased was getting out of the wagon when the applicant shot at him. Witness saw the pistol in the applicant's hand, and saw the blaze when it was fired. He saw nothing in the deceased's hands except the lines. When the pistol fired witness had turned down West Pine street, and did not stop, but kept on. After it fired he heard the applicant, with an oath, say: "I've got you, now,"

but witness could not remember the exact language used by the applicant when he cursed the deceased.

The cross examination of the witness elicited much repetition and many circumstantial details of no other apparent significance than as tests of his accuracy and credibility. He could not say where the applicant was at the moment the deceased stopped his wagon, nor could he say why the deceased stopped. He heard neither the applicant nor the deceased say anything at that time. After deceased stopped the applicant went up to deceased's wagon on the right hand side. Deceased dodged and tried to get out of his wagon on the same side as that occupied by the applicant. The applicant struck but once at the deceased, who dodged back and avoided the blow. Applicant had a pistol in his hands when he struck at the deceased. After the applicant struck at deceased, the latter tried to get out of his wagon, and when the shot was fired he had one foot on the hub of the fore wheel and the other in the bed of his wagon. Witness was then just in the act of turning down Pine street, below Newman's store. He could not see the hub of the right fore wheel of the wagon, nor could he see the deceased's foot; but both of the deceased's feet, when he was shot, were not in the wagon, nor was the deceased upon the ground. Witness saw no one in the street at that time besides the applicant and the deceased and a man in a buggy. When near the cotton yard on Pine street, the witness saw a man on horseback with his arms around the applicant's shoulders. Witness recognized the deceased when the latter stopped, but did not notice how either he or the applicant was dressed, nor whether the applicant had on a hat or not.

Re-examined, the witness stated that he thought the man he saw in the buggy was a colored man, and was certain that the vehicle in which that man was coming up the Avenue when the shot was fired was a buggy.

Sheriff M. M. Hornsby's testimony at the examining trial was next introduced by the applicant. Mr. Hornsby knew the applicant but not the deceased. Between six and seven o'clock in the evening of October 29, 1886, the witness saw the applicant on Congress avenue, between the northwest corner of the Raymond House and the southeast corner of Newman & Co.'s store. Witness was sitting on his horse about the middle of Pine street, and on a line with the alley in rear of said store, when his attention was attracted to the avenue by loud talking.

Statement of the case.

Witness saw a man coming up the avenue in a spring wagon, with his team headed north. The man was bringing his horses to a halt, and upon stopping his wagon he jumped to the ground. At that moment the witness turned his head to see what had become of two men whom he was watching, and whose conduct he thought was suspicious, when he heard a shot fired near the wagon which had stopped on the avenue. Looking towards where the shot was fired he saw two men separating. One of the two men was dodging under the neck of the wagon horse, and another man had gone three or four steps from the wagon in the direction of the Raymond House. The latter man turned around and faced the witness, who, being by that time in front of the team, saw that the man facing him was Tom Smith, the applicant. Witness remarked to him: "If you can't do any better shooting than that you had better give me the gun and consider yourself under arrest." He replied: "All right, Mr. Hornsby," and handed a pistol to the witness, remarking: "The d—n son of a bitch was about to run over me," or words to that effect. Just as witness was taking hold of the pistol he heard some one say: "Come here, Cousin West; I'm shot." Witness turned to see who was shot, and just then Hal Mason rode up and witness told him to "go and see who had been shot, and how bad he has been shot." By that time a crowd had assembled, and Mason and others remarked to witness: "There goes your man." Witness turned and saw Smith, the applicant, some fifteen or twenty feet off, and going towards the Raymond House. Witness dismounted and followed Smith into the hotel. Witness asked Smith, in the hotel, what the row was about, and he replied that it was about some baggage. The pistol handed to witness by the applicant was a short forty-five calibre. Witness could not remember exactly how it looked, but knew it had a walnut handle, and thought, but was not positive, that it was nickle plated. Though he did not examine the pistol critically, he was satisfied that one barrel had been fired. When the shot was fired the witness was about two hundred feet from Smith, the applicant. The flash of the discharge was just expiring as witness observed it. Witness delivered the pistol to the applicant's father, after the applicant gave bond. When the witness reached the wagon he saw no one there but the applicant and the deceased, but other persons came up immediately.

Cross examined, the witness stated that the person in the wagon jerked his team up and stopped suddenly, and immedi-

ately jumped out of the wagon. Witness saw a man on the east side of the wagon at the time it was stopped, and that man proved to be the applicant Smith. From where the witness was standing, on Pine street, he could not recognize either of the parties. Witness thought that the man on the ground was about six feet from the wagon when it stopped. When the man in the wagon jumped out of it as he did the instant it stopped, he and the man on the ground were brought right together—within striking distance of each other. The man on the ground was not close enough to the man in the wagon to strike him at the time the wagon stopped, and witness did not see the man on the ground make any motion to strike him. It took witness but a few seconds to ride to the wagon from where he had been standing, on Pine street. He saw no one come around Newman's store and pass up Pine street to the cotton yard. From the time the shot was fired until witness reached the applicant and deceased, there was no one between him and them. He saw no hack near the belligerents, and did not think there was then a hack there. When he got hold of applicant's pistol, he heard some one say: "Come here, cousin West; I'm shot," and he turned around and saw West Stewart's hack by the telephone pole near the foot bridge at Newman's corner; and this was his first sight of the hack. The hack was not there when he first rode up. The man who called for "West" was behind witness, and he did not see him. The heads of West Stewart's horses were turned up the avenue and rather towards the sidewalk. When the shot was fired, Stewart's hack was not standing on the curve of the street car track, nor was anything or person standing there at that time. Except the wagon from which the man jumped, there was then no wagon visible by the witness in any direction. Witness's recollection was that, after he and the applicant had got into a hack, his attention was called by the applicant to a bruised place on his face, but this may have occurred previously and while they were in the office or a corridor of the Raymond House. Applicant had a mark on his face that looked like a blow from a man's fist, but witness would not undertake to say how the applicant got it. Except during the conversation between witness and Hal Mason, the applicant had not been out of witness's sight or presence from the time of his arrest up to the time he called witness's attention to the mark on his face, and not more than ten minutes elapsed between those times. Applicant had opportunity to shoot the

deceased a second time before the witness reached him; and a quick hand with a pistol could have shot the deceased twice more before he passed around under the horse's neck.

On re-examination by the State, the witness testified that he did not see the deceased strike the applicant. After the shot was fired, witness kept his eye on both parties until one of them dodged under the horse's neck, and then he kept his eye on the applicant. When the deceased jumped out of his wagon he jumped towards and could have struck the applicant without witness seeing him strike. Standing where the witness was when the shot was fired, he could not see very far either up or down the avenue, but he thought he could have seen for three or four doors in either of those directions. Applicant did not have his hat on his head, and witness thought he did not have a coat on. After getting into the office of the hotel the applicant, witness thought, put on his hat and coat.

At this point the applicant, by consent, introduced the testimony of Doctor R. M. Swearingen, given before the coroner's inquest, held upon the deceased Clemons. About half-past seven o'clock of October 29, 1886, the witness examined Israel Clemons at the latter's home on Red River street in Austin, and discovered a bullet hole through the fleshy part of the right fore-arm, and a hole entering the right side immediately within the superior process of the ileum. The course of the ball seemed downward through the muscular tissue within the pelvis, and witness did not then believe that the abdominal cavity had been penetrated by the ball. Acute peritonitis, however, subsequently developed, and that induced the witness to think that the ball had deflected from its initial direction, and had wounded the peritoneum. Clemons died October 31, 1886, and witness believed that it was the wound in the side which caused the death.

William Collins, sworn for the applicant, testified that on October 29, 1886, he was a clerk in Alexander's dry goods store, which is two doors above Simon's saloon on Congress avenue. Witness was standing in the door of Alexander's store at the time the shot was fired, and he heard the shot. No hack was then standing on the curve of the street car track in front of Simon's saloon. Witness knew West Stewart by sight, but did not see him the night of the shooting. At the time of the shooting the witness saw no hack, but a very brief time after the shooting, say about two seconds, he saw a hack standing by the telephone pole in front of Newman's (which is on the opposite

side of Congress avenue from Simon's saloon). No one was in the spring wagon when the shot was fired. The spring wagon was then on the west side of the street car track, and on the avenue about the middle of Pine street. When the shot was fired the horse attached to the spring wagon backed a little and partly turned around in an eastwardly direction. The applicant was at that time one of the proprietors of the Raymond hotel. Witness had seen the applicant at Alexander's store without his hat.

Cross examined by the State, the witness said he did not know whose hack it was which he saw standing in front of Newman's store. After the shot was fired he saw two men near the street car track in the middle of the avenue. Immediately after the shot one of them took two or three steps towards the Raymond House and the other man started towards the spring wagon, which was on the west side of the street car track. As soon as the pistol fired, witness looked towards the spring wagon and got a glimpse of the flash of the pistol. Witness next noticed a man riding up on a horse, and immediately thereafter two or three other men walked up to the man who had started towards the Raymond House. Quite a crowd congregated in a minute or two. Witness did not see any hack coming in the street or the avenue. There certainly was no hack on the street car curve in front of Simon's; he would have seen it if there had been. Two or three hacks came down the avenue immediately after the shooting. When witness heard the shot and saw the two men going in different directions, those two were about six feet apart.

John Schelin was next sworn, for the applicant. He testified that on October 29, 1886, he was in the employ of Monroe Miller as driver of the omnibus. He knew the applicant by sight, and knew Israel Clemons, the deceased, and saw them in the evening of said day. While the witness was at the union depot a boy came after the baggage wagon, to go to the Raymond House for a trunk. The driver of the transfer wagon was not present, and witness got on the wagon and went to the Raymond for the trunk. Clemons came along behind witness, with his wagon, and, as witness was backing the transfer wagon up to the hotel, Clemons drove in between witness and the hotel, jumped out of his wagon, grabbed the trunk and started to put it in his wagon. Smith, the applicant, told Clemons the transfer wagon was there to take the trunk down. Clemons replied that the man sent him up after the trunk, and Smith again told him the

transfer wagon would take the trunk down. Clemons said that, by George, the man told him to come and get these trunks. Smith told him to let them alone; that the transfer wagon had come to take them down. Clemons then turned the trunk loose, and some colored boys assisted witness to put the trunks in the transfer wagon, when witness drove to the depot, leaving Clemons at the hotel. Witness supposed Clemons was talking to Smith, but could not remember what he said. After the train came in the witness started up the avenue on his 'bus, and when he had nearly passed the Raymond House he saw Clemons, who had stopped his wagon on the west side of the street car track, near Pine street. Witness drove on up the avenue, and saw Mr. Smith going across the avenue. When Smith got right close to Clemons's wagon, Clemons jumped out of it, and he seemed to witness to be jumping right on to Smith. Clemons and Smith looked like they were tussling. When Clemons jumped out of his wagon his hand was lifted like he was going to strike. They were right at each other and seemed to be tussling. A pistol shot was then fired. Witness was then some thirty or thirty-five feet up the avenue from where Clemons jumped out of the wagon. His team had moved along slowly, but he had not stopped. He supposed the pistol was fired by Smith, though he did not see either of the parties have a pistol.

The cross examination of the witness elicited little more than a repetition of his testimony in chief, with some alteration of the language. He stated that he was eight or ten minutes in going to and returning from the Raymond House to bring the trunks, and he supposed he then remained at the depot about twenty or thirty minutes, the train being fifteen minutes late. He heard no conversation at the depot between the deceased and a gentleman about a trunk. From where the witness was when the pistol fired he could see both Smith and Clemons plainly but could not see the pistol, nor did he see Smith raise his hand as if to shoot. He did not remember whether Smith was wearing either a coat or a hat.

William Stelfox, for the applicant, testified that he knew the applicant, but not the deceased. Witness's store stands two doors north of Newman's, on Congress avenue. He was standing in the front door of his store in the evening of October 29, 1886, when a shot was fired between Newman's and the Raymond House. He did not know who fired the shot, nor did he see the flash of it. He was looking in a different direction when

it was fired, and he turned and saw the smoke, and at the same time saw a delivery wagon standing in the avenue. No one was in the wagon, but there were two persons standing on the ground near it. Witness did not know who they were. He had been standing in his store door at least two or three minutes when the shot was fired, and he saw no colored boy pass down the sidewalk while he was in the door. Nor did he see any hack standing on the curve of the street car track at or near Simon's corner, and it was his opinion that if one had been there he would have seen it, though one may have been there. Immediately after the shot a hack came down the avenue in a trot, and stopped in front of the wagon near which the two men stood. Witness saw no hack before or at the time of the shooting.

Cross examined, the witness said that when the pistol was fired there were but two persons in the street and close to the wagon, but a crowd soon came up. Witness located the shot at about the spot where the two men were standing. He saw no omnibus driving on the avenue at that time.

C. E. Lucy, for the applicant, testified that they were partners in the keeping of the Raymond House. In about the time it took the witness to run a half a block, say fifteen seconds, after the shot was fired, he saw the applicant and Sheriff Hornsby coming towards the Raymond House from where the shot was fired. In about two minutes after it was fired the applicant walked to the dining room window, turned the blinds so that the light would fall on his face, and, in witness's presence, exhibited to Mr. Hornsby a bruised place on his face which had the appearance of having been made by a blow. Fifteen minutes previous that bruise was not on the applicant's face. This witness and others stated that it was the habit of the applicant to go bareheaded to the stores and other places in the neighborhood of the Raymond House.

Cross examined, the witness said that the wound on applicant's face was about an inch and a half in diameter, and was conspicuous and red.

Re-examined, witness stated that it was the rule of the hotel to send baggage to the depot by Miller's transfer wagon.

George Strubel, for the applicant, testified that he was behind the bar in Simon's saloon when a shot was fired on the avenue, October 29, 1886, in the evening. He started to the front door as soon as he heard the shot, and on reaching it saw West Stewart driving his hack down the west side of the avenue.

The hack stopped right where Israel Clemons then was, between Newman's corner and the street car track. Witness saw no hack on the curve of the street car track near Simon's corner. He heard West Stewart twice ask, "Israel, what is the matter?" and heard Clemons reply, "I'm shot." This was all the witness heard.

Cross examined, the witness said that when he went to the door he saw no other hack than Stewart's, nor any omnibus or other vehicle. If any other had been there he could have seen it. He did not see Hornsby about the deceased, but saw a horse there.

Re-examined, the witness stated that the first person he saw reach the deceased was West Stewart, but he could not say that no other person had reached deceased before Stewart. Two electric lights were burning in Newman's store, and one in Simon's saloon at the time, and Newman's front is nearly all glass.

All of the foregoing testimony (except Doctor Swearingen's) was that taken and reduced to writing at the examining trial of the applicant, which was concluded before T. F. Purnell, justice of the peace, on November 10, 1886. The next evidence introduced by the applicant was the testimony taken and reduced to writing at the hearing before District Judge A. S. Walker of the first writ of habeas corpus sued out in this case. At that hearing the testimony taken at the examining trial, and already detailed, was put in evidence by the applicant, as also the testimony of several new witnesses.

James E. Lucy, city marshal of Austin, testified that the reputation of the applicant as a peaceful, law-abiding young man was good. Witness also knew the witness Perry Scott, who was a colored boy about nineteen years old, and whose general reputation for truth and veracity was notoriously bad.

Cross examined, the witness stated that he was about two blocks up the avenue from the place of the shooting when he heard the report of the pistol, and he reached that place in about two minutes thereafter. He did not see Perry Scott there. Witness asked the deceased who shot him, and he replied "Tom Smith." Deceased said he was shot in the leg, but did not tell the witness how it occurred.

Re-examined, witness said that he went with the applicant, in a hack, to Justice Purnell's, and noticed a spot or bruise under

his right eye, which looked as if it had been caused by a lick or something of that sort.

J. A. A. Riley, for the applicant, testified that in the evening of October 29, 1886, he was at Stein's china store, on Pecan street, half a block west of Congress avenue, when some one running east said that somebody had been shot. Witness ran in the same direction, and when he reached the avenue he saw West Stewart driving his hack down the avenue on the west side of the street car track. But few seconds had then passed since witness had heard that a shot had been fired on the avenue. Witness had known the applicant about ten years, and knew that his general reputation was good as a quiet and peaceable boy and man.

Cross examined, the witness said that Stewart stopped about Pine street and turned his team around, and witness afterwards saw him come up the avenue and go out on West Pecan street, and return from there and drive off east.

C. D. Johns, for the applicant, testified that he knew the witness Perry Scott and his reputation for truth and veracity. That reputation was bad. John Cheneville, a veteran policeman of Austin, testified to the same effect. Several other witnesses testified for the applicant, and related many circumstances and incidents which they had observed on the evening of the fatal encounter, but their testimony was cumulative only, and is therefore omitted in this report.

Nelson Bennett, for the applicant, testified that he lived at Billings, Missouri, but was in Austin, Texas, the night of October 29, 1886. He went from the Raymond House to the depot to see about the train for Kansas City. Just as he got close to the depot he heard one colored man say to another: "That white son of a bitch of a hotel man took that baggage away from me, and if I ever get a chance I will kill him," adding, "I've had it in for him for some time." After finding out about his train and getting his ticket, the witness returned up the avenue and passed the Raymond House to the foot bridge at its northwest corner and there waited for some minutes to find a friend whom he had left at the Raymond. The first thing observed by witness was a one-horse wagon coming up the avenue almost opposite him. The wagon was on the west of the street car track, and was nearer to Newman's corner than to witness. It stopped very suddenly, as it seemed to witness. When the witness first saw the wagon the man in it was sitting down, but

about the time it stopped he stood up, said "d—n you, I've got you now," and jumped out of the wagon on the east side. He jumped out at some one, and quite a little scuffle ensued between him and a man on the ground. Witness walked over towards the wagon, and as he got near the street car track a shot was fired, and he turned towards Simon's saloon. A gentleman on horseback, who he learned was the sheriff, came up and arrested the smaller of the two men engaged in the fracas, and took him over to the Raymond House. Looking back to the door of the Raymond House witness saw the applicant there under arrest. The witness recognized the colored man who was engaged in the scuffle as the same one who had made the threats at the depot. Witness, when he walked out toward the wagon, could not see the attitude of the combatants when the shot was fired, nor whether they had hold of each other or not, but they were right close together. When the colored man jumped out of his wagon he had his arm raised, and his hand was on a line with his shoulder. Witness did not notice the small man until the colored man jumped out of the wagon, and then he was within a few feet of the wagon. When the colored man jumped from the wagon he was very close to the small man, but witness could not give the exact difference between them. During the scuffle they had hold of each other. A hack drove down the avenue a few seconds after the shot was fired. It was the only hack seen by the witness, and it turned in towards Newman's corner and stopped there. Witness saw the wounded man put into the hack, but heard nothing that may have been said.

Cross examined, the witness said that he had been on the foot bridge two or three minutes when he saw the wagon coming up the avenue. If the applicant passed the witness at the corner, the latter did not see him. Witness did not know whether the applicant was bareheaded or not. Witness did not stop at the Raymond, but at the Bateman House. Witness was a printer by trade, and worked on the "Advertiser" newspaper at Billings, Missouri. The friend he was looking for was named Mortimer, who came to Austin from New Laredo, but witness did not know where Mortimer lived. Witness wrote to the applicant from Billings, Missouri, informing him of what he, witness, knew, and the attorneys of applicant sent witness the railroad ticket on which he returned to Austin. Witness wrote to the applicant from mere motives of humanity, and not because he wanted to

get his expenses paid back to Texas, though it was understood his expenses were to be paid.

Re-examined, the witness said that he left Austin for Missouri on October 30, 1886, and did not see Smith before he left. What caused him to write to Smith, the applicant, was a telegram in the St. Louis "Globe-Democrat" stating that the negro had died and that Smith was not admitted to bail. A ticket and ten dollars were sent witness to Billings, Missouri, and the understanding is that his expenses here and back to his home are to be paid. He loses his time and is out two weeks wages. Much of the testimony of this, as well as of other witnesses, has been omitted because it was mere repetition or inconsequential.

F. W. Bartlett, a resident of Jefferson, Texas, and a second cousin of the applicant, was the next witness. He was night clerk at the Raymond House in Austin from May until December, 1885, and during that time the deceased, Israel Clemons, was a porter or a bell boy in the hotel. On January 30, 1886, witness was going from Houston to Galveston on the Santa Fe train, and near Hitchcock station he went into the smoking car, and while there deceased came up to him and asked where he was going. Witness replied that he was going to Galveston and thence to California. Deceased inquired why witness had quit the hotel, and whether witness had had any trouble or was mad "at them." Witness replied that he had had no trouble, and deceased said that "most all of them were dissatisfied and having trouble with the new management," and that Tom Smith (the applicant) had always treated him badly, and had discriminated against him, and had put the police against the boys for "playing craps." Witness started to go into the other car, when the deceased said: "The dirty little white headed scamp, I will kill him the first chance I get," and, as witness moved off, the deceased pointed to his own body and said: "I have the thing here to do it with." Through the opening of deceased's vest the witness saw what he took to be a pistol. Witness understood that the applicant was the person referred to by the deceased as "the dirty little white headed scamp."

The cross examination elicted but little of any significance. Witness thought the employes at the Raymond knew him to be a cousin of the applicant, inasmuch as they must have heard him called "cousin" by the applicant and Tom Smith, sr. Witness left the smoking car because the talk of the deceased

was offensive to him, and he wanted no trouble with the deceased.

Reuben Johnson, for the applicant, testified that he knew both the applicant and the deceased by sight. About seven o'clock in the evening of October 27, 1886, as witness was driving in a delivery wagon down Congress avenue, he met the deceased near Newman's store, coming up the avenue in his wagon. Witness passed within about five feet of the deceased, and when witness had got about fifteen feet off he heard the applicant call the deceased. The applicant went right up to deceased's wagon on his right side, and a conversation passed between the applicant and the deceased, but witness could not tell what they said. Three licks passed between them, but witness could not say which of them gave the first lick. After the licks were passed the applicant stepped backward from the wagon, and the deceased jumped out of the wagon right after him, and ran right up to him. Witness could not say whether or not the deceased had anything in his hands, but they were raised up in front of him. A pistol then fired and deceased whirled and ran within about five feet of Newman's sidewalk, and then put his hands on the front of his body and exclaimed "Oh!" and whirled back, and by the time he got about five feet towards his wagon, West Stewart rode up and asked him what was the matter. Deceased replied: "Tom Smith shot me;" and then said: "Some of you boys get my wagon." The applicant had backed about ten steps from the wagon when the shot was fired. Witness did not see any other wagon or vehicle below him on the avenue at that time, and would have seen one if any was there. If West Stewart's hack was standing by Simon's corner when the shot was fired the witness did not see it, nor did he see Stewart himself until the latter hailed and inquired what was the matter.

Cross examined, the witness said that the applicant, when he called to the deceased, was on the sidewalk at the corner of the Raymond House, and he called loud enough for witness to hear him. When the applicant called, witness checked up and the deceased stopped still. Then the applicant, in a peart walk, or nearly a trot, came from the Raymond House corner to the deceased's wagon, and when he reached it a conversation took place between applicant and the deceased. They talked about two minutes, but witness did not understand their words. Then the witness saw the applicant striking at the deceased with a

pistol. Witness could not say whether the deceased was striking at the applicant or was defending himself. Up to this time the deceased had remained in his wagon. The applicant then got back about ten steps from the wagon, and, as he walked off, the deceased jumped off his wagon, followed the applicant, got right up to him, and then the pistol fired. Witness sat there and looked at them, the applicant stood there, and the deceased ran off towards Newman's, and got in about five feet of the sidewalk. The witness then repeated his previous statements as to what was said by the deceased and by West Stewart. He also stated that he plainly saw the space intervening between the deceased's wagon and the Raymond House, and he saw no one standing at or near the bridge at the corner of the Raymond House. If a man had stood there for a few minutes before the difficulty, or at the time the applicant came out there, witness would have seen him. The applicant came out with his coat on but without a hat. Witness saw nothing in the applicant's hands when the latter came across the avenue from the Raymond House, nor did he see where the applicant got the pistol.

On his re-examination, this witness said that when the licks were passing between the combatants, they were both striking "in the same motion." Witness saw no one come on horseback before the applicant went over to the Raymond House.

In the opinion of a majority of this court, as will be observed, all testimony relating to certain acts and declarations of one John Alexander (a clerk at the Raymond House) are excluded from consideration, because there was no proof connecting the applicant with them. This objection was taken in the court below to so much of the testimony of G. H. Reynaud, T. H. Smith, L. B. Goff, L. Eck, J. C. Petmecky and Corr Lucy as related to the declarations and acts of said Alexander, who, it is to be noted, was not produced as a witness by either side. The substance of this part of Reynaud's testimony was that he was in Eck's pawn broker shop after six o'clock in the evening of October 29, 1886, when John Alexander came in and asked for a pistol. Eck showed him one, and Alexander said: "This pistol won't do; I want another,"—or "a forty five." Witness did not know whether Alexander got a pistol at Eck's or not. About fifteen minutes later the witness was at Petmecky's gun shop, and there again saw John Alexander, who came in and said: "I want to get this pistol loaded," or words to that effect. Mr.

Goff waited on him and he left.    Witness thought that not more than twenty-five minutes next elapsed before the shot was fired on the avenue, and perhaps not more than five or ten minutes, as he took no notice of the time.

T. H. Smith, head waiter at the Raymond House, testifying as to Alexander, said that he, witness, was in the dining room when the shot was fired, and, hearing it, ran thence to the front door, and there found John Alexander looking in the direction of where the applicant and the deceased were in the avenue.    Witness stopped, and Alexander said to him: "Go on—it's Tom;" whereupon witness went on and found the applicant and several other people out there.    At that time Alexander was clerk in the office of the Raymond House, but witness had not seen him since the preceding Sunday, and did not know whether he had ceased to be an employe of the house.

L. B. Goff testified that he was working in J. C. Petmecky's gun store on October 29, 1886.    Witness knows John Alexander, and saw him at Petmecky's store a little after dark in the evening of said day.    He had with him a forty-five calibre six shooter and came to buy some cartridges.    Witness sold him six cartridges, and he put them in the pistol, paid for them, and went out of the store.    Witness was in said store when the shot which wounded the deceased was fired, and thought that shot was fired about fifteen minutes after John Alexander left the store.

L. Eck testified that he was a pawn broker in Austin, and knew John Alexander, who, in the evening Israel Clemons was shot, came to witness's to get a pistol for Tom Smith, jr., as he said.    He got a Colt's six shooter, which was either a forty-four or a forty-five calibre, and which the witness hired to him for Tom Smith, jr.    The pistol was not loaded when Alexander took it off, and a day or two afterwards it was returned to witness by some person whom he could not remember.

J. C. Petmecky testified in substance as did Reynaud and Goff with regard to John Alexander's call at witness's gun store, and thought the shot was fired some fifteen or twenty minutes after Alexander left the store.

Corr Lucy testified that he and the applicant conducted the Raymond House as partners, and John Alexander was in their employ on October 29, 1886.    Alexander had not been discharged, and had worked at the Raymond House until "last Monday," since when the witness had not seen him.    The witness did not know Alexander's present whereabouts, and had no information

in regard to it. "Alexander and I were standing in the door on last Monday; he said, 'let me get inside,' and Mr. Peck came up. Peck, the deputy sheriff, hunted for him; I don't know whether he found him or not."

The testimony just narrated, of the last six witnesses (Lucy, Petmecky, Eck, Goff, T. H. Smith and G. H. Reynaud), is that referred to in the opinion of the majority of this court as excluded from consideration for the reason therein given.

G. H. Reynaud, however, gave further testimony, and stated that when the pistol fired he ran over to the wounded negro, and was the person who first reached him. Deceased was walking bent to one side, holding his arm close to his body. Witness asked him where he was shot, and he said in the arm and leg. Just then he hailed a hackman and asked him to take him home. The hackman said: "What is the matter?" Deceased replied: "I am shot." The hackman said: "Who shot you?" and deceased replied: "Smith." The hackman said: "What for?" and the deceased replied: "Something about a trunk." The deceased had then got into the hack, and witness told the hackman he had better go home with deceased as quick as he could. Witness then left the hack, and saw a man on horseback in the avenue, and a bareheaded man standing with his hand on the saddle or the mane of the horse. Witness saw no man standing near the bridge or awning at the northwest corner of the Raymond House, nor any man walk into the street and near the parties just before the shooting. He did not see the man Nelson Bennett there at all, nor anywhere previous to this trial, but he might have been there and witness not have seen him. If, however, there had been a man at the street car track, within five feet of the deceased, witness thought he would have seen him.

Nelson Bennett, whose testimony is set out in a previous part of this report, was re-called for further cross-examination, which, however, elicited nothing except an account of himself and his movements in Austin subsequent to his arrival from San Antonio in the forenoon of October 29, 1886.

Ferrin Clemons, the father of the deceased, testified that the latter did not go to Galveston or Houston in January or February, 1886. The witness was positive of that fact, and that the deceased was not away from the witness's house, which was his home, two successive nights during the time referred to.

Sheriff Hornsby testified that he saw no person near the corner of the Raymond House, nor near the combatants when the shot

was fired.   Witness said he had given his testimony fully at the examining trial, which testimony has already been related in this report.

John Davidson was introduced and gave evidence, but his testimony was but cumulative, and is therefore omitted.

The foregoing is a much condensed statement of the voluminous evidence in the record, but it is believed that it covers every fact of any legal significance or consequence.   The applicant reserved a bill of exceptions to the refusal of the court below to grant him bail when the State had made no other showing than the indictment, the capias, and the sheriff's return of the latter; and also a bill of exceptions to the refusal of the court below to exclude and suppress all the testimony relating to the declarations of John Alexander.

*Sneed, Pendexter & Burleson* and *Walton, Hill & Walton,* for the applicant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   In Scoggin's case (6 Texas Ct. App., 546) this court, in discussing and determining the question as to the burden of proof upon the hearing of the writ of habeas corpus in a capital case, said: "The indictment against him being for a non-bailable offense, prima facie, justified his detention in prison.   He undertook to show that he had a constitutional right to be admitted to bail; *i. e.,* that the proof of his guilt was not evident.   This could only be shown by exhibiting the proof. * * * * We believe that when a person is brought before a court of competent jurisdiction on a writ of habeas corpus, if it appear by the return of the papers attached that he is indicted for a capital offense, it is incumbent on him to show that he is entitled to bail; if he declines to introduce any evidence bail should not be allowed him."

This rule was re-affirmed in Randon's case (12 Texas Ct. App., 145), and has not been overruled, or even questioned, in any subsequent decision of this or any other court, that we are aware of, but on the contrary, stands approved by every authority, without a single exception that we have examined.   (Church on Hab. Corp., sec. 404; Vaughn's case, 44 Ala., 417; Strange's case, 59 Cal., 416; Springer's case, 1 Utah, 214; Hefren's case, 27 Ind., 87; Rhear's case, 67 Ala., 94; Jones's case, 55 Ind., 476; Ken-

dall's case, 100 Ind., 599; Street's case, 43 Miss., 1; Bridewill's case, 57 Miss., 39; Glason's case, 75 Ala., ——; 1 Bishop Crim. Prac., sec. 262; Lynch's case, 38 Ill., 494; Hurd on Hab. Corp., 438–446; Cooley's Const. Lim., 380; Tinder's case, 19 Cal., 539; Mills's case, 2 Dev., N. C., 421; Hight's case, 1 Morris, Iowa, 410; Holley's case, 15 Fla., 688.)

Independent of this line of concurring authorities, it seems that the rule announced in Scoggin's case, supra, is impliedly sanctioned and established by a fair and reasonable construction of our habeas corpus act. In his petition for the writ the applicant must allege that he is "illegally restrained in his liberty," and oath must be made that the allegations of the petition are true, according to the belief of the petitioner. (Code Crim. Proc., art. 144,) This allegation is an *affirmative* one, and a well established rule of pleading is that the burden of proof rests upon the party who holds the affirmative of an issue. He is the *actor*, and it devolves upon him to establish by evidence the truth of what he affirms. Article 171, Code of Criminal Procedure, reads: "If it appear by the return and papers attached that the party stands indicted for a capital offense, the judge or court having jurisdiction of the case shall nevertheless proceed to hear such testimony as may be offered on the part both of the *applicant* and the *State*," etc., clearly indicating that the testimony on the part of the applicant—the *plaintiff*— shall be offered first. Article 179, Code of Criminal Procedure, provides: "The applicant shall have the right to open and conclude, by himself or counsel, the argument upon the trial under habeas corpus," again clearly indicating that he holds the affirmative, and must establish his allegation that he is "illegally restrained in his liberty."

Again, the very section of the Bill of Rights which guarantees bail, contains the same implication. It provides that capital offenses, where the proof is evident, shall not be bailable, but further provides that this exception shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law. (Bill of Rights, sec. 11.) Our habeas corpus act provides the manner of such examination, and, as we have seen, devolves the initiative upon such examination, after indictment found, upon the applicant, not expressly, but impliedly.

The rule we are discussing seems also to be founded in reason. If an indictment for a capital offense does not prima facie estab-

lish a non-bailable offense, the accused party would be entitled
to bail the moment he was arrested, and the officer who would
have the temerity to refuse him bail, when tendered, would be
guilty of false imprisonment, and liable to prosecution and pun-
ishment for that offense, as well as liable in a civil suit for dam-
ages.   An indictment for a capital offense, for all the purposes
of a habeas corpus proceeding, carries with it the presumption
that it is founded upon proof evident.   For reasons apparent to
the legal mind, no presumption of guilt arises from an indict-
ment when the case comes to be heard upon the final trial.   Then
the presumption of innocence attaches and continues through-
out the trial, because then the State and not the accused is the
plaintiff, the actor, the party who holds the affirmative of the
issue, and who must assume the burden of proving the offense
alleged.   A majority of the court believe and hold that the rule
as stated in the Scoggin case, supra, is the correct one, and it
is adhered to and reaffirmed.

All the members of the court concur in the opinion that the
declarations and acts of John Alexander were inadmissible, it
not being shown that applicant Smith authorized the same, or
was in any manner connected therewith.   This illegal evidence
is not considered by us in passing upon the facts of the case.

Before passing upon the facts of the case we will consider a
preliminary question which has been presented and argued with
ability by counsel for applicant.   In Foster's case, 5 Texas Court
of Appeals, 625, this court defines and explains the words "proof
evident," and lays down two rules by which judges and courts
should be guided in determining whether or not the proof is evi-
dent.   The first rule is that announced in Commonwealth v.
Keeper of Prison (2 Ashm., 227), and is as follows: "A safe rule,
where a malicious homicide is charged, is to refuse bail in all
cases where a judge would sustain a capital conviction if pro-
nounced by a jury on such evidence of guilt as was exhibited to
him on the hearing of the application to admit to bail; and, in in-
stances where the evidence of the Commonwealth is of less effi-
cacy, to admit to bail."   The second rule is that laid down in
McAnally's case, 53 Alabama, 395, and is as follows: "If the
evidence is clear and strong, leading a well guarded and dispas-
sionate judgment to the conclusion that the offense has been
committed; that the accused is the guilty agent, and that he
would probably be punished capitally if the law is administered,
bail is not a matter of right."

These rules were subsequently quoted and approved in Beacom's case, 12 Texas Court of Appeals, 318; and in Coldiron's case, 15 Texas Court of Appeals, 464, the second rule above stated was quoted and approved.

With respect to the first rule, we are convinced that it is wrong, and should no longer be recognized as a guide. It is ably and justly criticized in Budewell's case, 57 Miss., 39, in the following language: "A verdict of conviction where no error of law has intervened, will never be set aside unless manifestly wrong, or, as is sometimes said, if there be any evidence to support it. To say that bail will only be granted where there is no evidence showing guilt, or where the proof of guilt is so slight upon the whole testimony that a conviction would be manifestly wrong, is plainly inconsistent with the constitutional requirement that it shall be granted in all cases except where the proof is evident or the presumption great. The error of the Pennsylvania rule" (the rule under consideration) "is in failing to give due effect to a verdict of conviction, or in overlooking the vast change it effects in the attitude of the party. By it the legal presumption of innocence is overthrown, all doubtful questions of fact are resolved in favor of the State, and the credibility or non credibility of witnesses is conclusively established. As before remarked, where no error of law has been committed to the prejudice of the accused, the verdict will not be set aside unless the court can say that it is without evidence to support it, or that upon a review and inspection of all the evidence the finding is plainly erroneous. To apply such a test to a proceeding for bail, and to declare that it will be denied unless the relator has demonstrated that the evidence against him is of a like unsatisfactory character, is to reverse the constitutional requirement, that it shall be granted unless the proof is evident," etc.

With regard to the second rule, it is not, as we can perceive, objectionable. It is, as we understand it, in harmony with the constitutional requirement that bail shall be granted unless the proof is evident. It is, in effect, the same rule stated as a correct one in Budewell's case, supra, but in different language, that is, "If, upon the whole testimony adduced, the court or judge entertains a reasonable doubt whether the relator committed the act, or whether in so doing he was guilty of a capital crime, bail should be granted." This rule applies when the case is considered on appeal, the court keeping in mind the prima facie legal presumption that the action of the trial judge was correct.

A majority of the court are not to be understood as holding that under the operation of this rule the evidence, though *conflicting*, may not at the same time be *evident*. To the mind of the tribunal passing upon the evidence the guilt of the applicant of a capital offense may be *evident*; that is, clear, strong, not admitting of a reasonable doubt, and yet there may be evidence in conflict with such inculpatory evidence. It is not all conflicting, exculpatory evidence that will have the effect to raise a reasonable doubt of guilt and destroy or impair the force of "evident proof" made by inculpatory evidence. It is for the judge or court who hears the testimony to consider the evidence as a whole, and if by the entire evidence a reasonable doubt of the applicant's guilt of a capital offense is not generated, the proof is evident and bail should be denied.

A majority of the court, considering the evidence in this case as a whole, notwithstanding there is a conflict in it with regard to the facts transpiring at the very time of the homicide, are of the opinion that such conflict does not affect the grade of the homicide, even conceding the truth of the defendant's testimony, and that there is no error in the judgment refusing bail. Wherefore the judgment is affirmed.

*Affirmed and bail refused.*

Opinion delivered February 16, 1887.

## DISSENTING OPINION OF HURT, J.

HURT, JUDGE. The appellant, the relator below, made application for bail to the district judge of Travis county. The writ of habeas corpus was issued, and was answered by the production of appellant in court, the sheriff answering for cause of detention, that he held him by virtue of a capias issued upon an indictment charging him with the offense of murder in the first degree.

Upon the hearing under the writ, the State introduced the indictment, capias and the sheriff's return thereon, and there rested its case. Upon this state of case, the appellant asked to be admitted to bail, propounding that the case made was not such "evident" case as is contemplated in the Bill of Rights. The court refused this claim, holding, in effect, that the papers put in evidence made a prima facie "evident" case against the relator, placing upon him the burden of showing by evidence that the homicide was not murder of the first degree. The court

grounded this holding upon Ex parte Randon, 12 Texas Court of Appeals, 145. An exception was reserved and is now presented to this court.

Was this holding in the Randon case a correct exposition of the law? Section 11 of the Bill of Rights provides: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses where the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law." That portion of this reservation of right to accused persons which prescribes the quantum of proof required ("evident" proof) may be rendered in another form. Thus: All prisoners shall be bailable by sufficient sureties in all cases, capital or otherwise, unless the proof be evident that the offense is capital. Hence, all persons charged with capital offenses are bailable by sufficient sureties unless the proof is "evident;" the rule as to bail being that whether the offense be capital or otherwise, bail shall be allowed; and the exception being the case in which the offense charged is capital *and* the proof "evident." Unless both these things, viz., the character of the offense and the amount of proof necessary to support it, concur, the offense is bailable. The general rule, therefore, being in favor of bail, the party relying upon the exception to the rule must allege and prove the exception.

The allegation contained in the sheriff's answer in this case is that the relator is held under an indictment charging a capital offense. Under the rules of pleading in civil cases this answer would be insufficient; since, in order to deny the person charged this right, the proof of its capital nature must be evident. Let us concede for argument that the answer setting up an indictment for murder of the first degree alleges by inference a capital offense in which the proof is evident (a proposition which propounds a legal monstrosity), and that, therefore, the case is brought within the exception; the exception to the general rule being for the benefit of the prosecution, the prosecution must prove it. It must be shown by the State, from the evidence, that the proof is "evident" that the relator is guilty of a capital offense. But it is insisted that this is shown by the indictment, which charges the offense to be capital. Let it be conceded that the indictment furnishes proof of the allegations therein made, what are these allegations? They are that the relator is guilty of murder of the first degree, and hence guilty

of a capital offense. There is no allegation that the relator is guilty of a capital offense in which the proof is "evident." The indictment is as silent as the grave as to the character of the proof. The grand jury are not required to find the proof "evident" to justify them in making a presentment for murder of the first degree, or any other offense concerning which they inquire. Looking to the indictment, therefore, we find that the relator is only charged with a capital offense, and nothing further, and we have seen that a capital offense is bailable in all cases, saving and excepting where the proof is evident.

We desire now to discuss the propositions as bearing upon the questions stated in the Randon case, before cited.

1. "Where an applicant to bail is shown to be held in custody under a capias issued upon a valid indictment, he is not illegally restrained of his liberty; and, to entitle him to bail, it is incumbent upon him to show by proof that the charge upon which he is indicted is a bailable one. In other words, the applicant must show that, though held to answer a charge of capital offense, the proof is not evident against him, in order to meet the requirement of the Bill of Rights."

It is true that when the prisoner is held under a capias founded upon a valid indictment, he is not illegally restrained of his liberty. And this would be equally true if the indictment charged murder of the second degree, or theft. But can this be said when the prisoner is ready with sufficient sureties demanding bail of the proper authority? The restraint is illegal in no case in which the prisoner is held under a legal capias, whether charged with a capital crime or misdemeanor. The illegality consists in holding him when he applies for bail to the proper authority, with sufficient sureties, and is denied bail. And as the general rule in all cases, whether capital or not, is in favor of bail, to justify a denial of it the State must bring the case within the exception, by producing testimony to show a capital offense in which the proof is "evident."

2. It was further said in the Randon case: "The court, being informed as to the nature and cause of his arrest and detention, could not do otherwise than to remand him to custody, for the reason that, prima facie at least, he was being held for a non-bailable offense."

The position here assumed is that, where a prisoner is charged with a capital offense, the presumption of guilt arises, and at least a prima facie case is presented. I hold that nothing be-

yond allegations can be presumed, if anything can be presumed at all. And, conceding that presumptions may be made from the charge of the indictment, no presumption can be made without allegations. As we have seen that the indictment merely charges a capital offense, we may presume the prisoner guilty of capital offense, and nothing further. But this does not meet the requirements of the Bill of Rights; for though capital, unless the proof is "evident" that it is so, the offense is bailable. It is, therefore, clear that to sustain this second proposition, the charge of the capital character of the offense must be proved, and, further, that the proof of its being capital is evident. We are assuming as true more than is alleged; for the presumption that the proof is evident—being unsupported by allegations—is without support, and is unwarranted.

We have been treating the subject upon the assumption that some presumptions may be indulged from the fact that the grand jury has charged a prisoner with a capital offense. We now propose to discuss the question as to whether any presumption can be legally drawn from the charge in the indictment at all. We seriously ask, by what authority can a court hold that which has never been held as proof in any other case, as proof "evident" in this case? Why shall we say that the presentment of a grand jury is evidence in this, when it is evidence in no other case? To illustrate: A is indicted for a capital offense, and on an application for bail the indictment proves him guilty as charged. B is indicted for a capital offense; is upon final trial, and the indictment proves nothing—is evidence of nothing except that B is indicted for a capital offense. We demand a reason for this distinction; for, if the indictment proves guilt in A's case, its probative force is just as cogent in B's case. In A's case, the proof must not only show guilt of a capital offense, but it must be "evident." In B's case, the proof must show guilt beyond a reasonable doubt; but in both cases the guilt of the party is the issue of fact to be determined. If it be granted that proof beyond a reasonable doubt and "evident" proof are the same, so far as quantum of proof is concerned, then the fact to be determined in both cases would be precisely the same, and with the same quantum of proof. How, then, it is asked, can the indictment be presumptive proof of one and not of the other? Upon what principle of evidence can this distinction be sustained? Mr. Bishop, one of the most philosophical of our elementary writers, in his work on Criminal Procedure, makes the following

remarkable observation: "The grand jury is a part of the court, and the judge, after it has found an indictment, should assume that it had evident proof, so that, in a capital case, prima facie the indicted defendant is not entitled to bail." Coming from this high authority, this is indeed a startling proposition. As the grand jury is "a part of the court," upon its finding alone the judge should assume that it (the grand jury) had evident proof. This would be a most reckless assumption, unwarranted from the known conduct of grand juries, by reason or any rule of presumption. Is not the grand jury "a part of the court" in any case of indictment? If so, why may not the jury, on final trial, as well as the judge on hearing for bail, assume, from the finding of the indictment, that the party indicted is guilty? This last assumption is as reasonable as that made by the judge; for in the first case the judge assumes from the indictment that the proof before the grand jury was "evident;" assumes that the grand jury would not have presented an indictment charging a capital offense without "evident" proof of guilt of such offense; that the grand jury had before it a character and amount of proof not required by any State or country as a basis for the presentation of an indictment, or assumes as a general rule that the party indicted for a capital offense is evidently guilty of such offense. We defy the production of such an illogical, unreasonable and unwarranted assumption of fact, save in cases of this character, viz., bail.

Let us pursue the authorities a little further, promising a return to the subject of presumption before closing. In The People v. Lindon & Smith, 19 California, 538, this proposition is stated: "An indictment, under our criminal practice act, is something more than a mere accusation based upon probable cause. It is an accusation based upon legal testimony of a direct and positive character, and is the concurring judgment of at least twelve of the grand jurors that, upon the evidence presented to them, the defendant is guilty." This inference of the court is drawn from the fact that the statute of that State requires the grand jury to find a bill only in cases in which all the evidence before them, taken together, is such as, in their judgment, would, if unexplained or uncontradicted, warrant a conviction by the trial jury; and if such evidence, unexplained or uncontradicted, would not warrant such conviction, they ought not to find an indictment. The constitution of that State contains a provision that "all prisoners shall be bailable by sufficient sureties, unless

for capital offenses, where the proof is evident or the presumption great." It will be seen at once that the inference made from the finding of the indictment is based upon the fact that the law requires that there shall be before the grand jury legal and direct testimony sufficient to warrant conviction upon final trial upon the offense charged. The law requiring this, it is assumed that the grand jury obeyed the law, and that such testimony was in fact before them. It will also be observed further on that the court assumes from the indictment, not that the *proof* was *evident*, but that the presumption was great. To the same effect are most, if not all, of the cases upon this subject. (State v. Mills, 2 Dev., 421; Hight v. The U. S., 1 Morris, 411; Lord Mahan's case, 1 Salk., 104; The Territory v. Benoit, 1 Martin, La., 142.)

In this State, however, the prisoner is bailable unless in a capital case where the proof is "evident." *Presumption* has no part or lot in this matter. If, however, we use the word *"presumption"* to express the effect or result of the circumstantial evidence in the trial for bail, we would not object; for it would, when thus used, be proof. But we deny that a presumption from the presentment of the indictment can be tortured into *proof*.

But to return to the case under consideration. It is held that "The finding by the grand jury of the indictment can not be reviewed on application for bail in capital cases. The statute makes no provision for preserving the testimony taken before the grand jury, and impliedly prohibits the disclosure of such testimony, except in certain cases specially named. Nor can affidavits or oral testimony as to the guilt or innocence of the accused, be received to rebut the presumption of guilt arising from the indictment in capital cases, except under special and extraordinary circumstances." In support of this proposition, decisions from States having like constitutional provisions, as well as from the common law, are cited, viz: The People v. Benoit, 1 Martin (La.), 142; The People v. Hyler, Parker's Criminal Reports, 570; People v. McLeod, 1 Hill, 394; Hight v. The United States, 1 Morris, 410; 1 Chitty's Criminal Law, 129; State v. Hill, 2 Dev., 421; Burr's trial, 312.

Now to restate: "All prisoners shall be bailable by sufficient sureties unless in capital cases where the proof is evident or the presumption great." A is charged by indictment with a capital offense. The presumption is great, because he *is* so charged.

The presumption is conclusive, because he is not permitted, on trial for bail, to introduce the witnesses who were before the grand jury, or by affidavits or oral testimony to show his case bailable unless under special and extraordinary circumstances. The result reached is precisely the same as at common law, viz: When indicted for a capital offense, or other felony, the prisoner is not entitled to bail except under special and extraordinary circumstances. This being the result reached by presumption, the prisoner's right to bail, in a capital case, remains, notwithstanding the Constitution, just as it existed at common law; just as it would if the constitutional provision had made no mention of capital cases at all; and hence the Constitution should have provided that all persons shall be bailable by sufficient sureties, unless indicted for a capital offense; but, if indicted for a capital offense, may be bailed under "special and extraordinary circumstances." This, however, would have been superfluous. Under the Constitution the prisoner is entitled to bail in capital cases unless the proof is evident or the presumption is great; but by *construction* he is entitled to bail in capital cases only under "special and extraordinary circumstances." Now, this *construction* is correct if "proof evident or presumption great" means nothing more nor less than a case where the prisoner is indicted for a capital offense.

The common law rule being well understood by the Constitution makers, may we not with reason presume that it was intended to change this rule and give the prisoner, whether charged by indictment or otherwise, the right to bail in capital cases, unless where the proof was evident, or the presumption (arising from legal testimony) was great? May we not for once presume that, instead of approving the common law rule, in capital cases as well as other felonies, it was the intention of the Constitution makers to depart from the common law? For it appears very difficult, in a great many instances, for the people in their sovereign capacity to break loose from the common law. Though employing the clearest and most explicit language to express their will, the courts, when called upon to enforce their enactments, with hot haste rush to the common law for construction where none is needed, and frequently by assumptions, reckless presumptions and constructions, emasculate or render nugatory the simplest and clearest constitutional provisions.

In this case what have common law rules to do with this plain provision of the Bill of Rights? The meaning is obvious. "All

prisoners shall be bailable by sufficient sureties, unless in capital cases where the proof is evident or the presumption great." What is meant by "evident" proof? Undoubtedly such proof as shows the prisoner's guilt, at least, beyond a reasonable doubt. What is meant by presumption great? Evidently that the presumption (arising from competent legal evidence, properly ascertained) of guilt of capital offense is fixed at least beyond reasonable doubt. Now, by what authority and upon what ground can a court hold the "presumption great," from the mere finding of the indictment? Solely upon a common law rule which was made in the absence of such a provision as is contained in the Constitution.

This rule, it may be added, is closely allied to a family of rules which were blots upon the judicial history of England; such as that in felony cases the accused was not permitted to introduce any testimony, or allowed counsel; and, when afterward allowed to introduce witnesses, they were not permitted to be sworn. "The prisoner was not permitted, in felony cases, to call witnesses, though present; and the jury were to decide on his guilt or innocence, according to their judgment, upon the evidence offered in support of the prosecution. And though this latter practice of rejecting evidence for the prisoner was abolished about the time of Queen Mary, yet the witnesses could not be sworn in behalf of the prisoner, but were examined without any particular obligation, and therefore obtained but little credit with the jury. It is noticeable that Queen Mary, in appointing Sir Richard Morgan Chief Justice of the Common Pleas, enjoined him 'that, notwithstanding old errors, which did not admit of any witness to speak, or any other matter to be heard in favor of the adversary, Her Majesty being party, Her Highness's pleasure was that whatever could be brought in favor of the subject should be heard, and, moreover, that the justices should not persuade themselves to sit in judgment otherwise for Her Highness than for the subject.' The greatest legal authorities are evidently of opinion that there was no foundation in reason for these tyrannical practices." (1 Chitty's Crim. Law, 624.)

Now, it is very remarkable, indeed, that "the greatest legal authorities" were "decidedly of the opinion that there was no foundation in reason or in justice for these tyrannical practices," and yet a woman, not presumed to be learned in the law, should, in advance of the learned judges, take this first step forward on the line of justice and reason. By her the tyranni-

cal practice established by the learned judges was repudiated; and her Chief Justice of the Common Pleas, as well as other justices of the realm, were enjoined "not to persuade themselves to sit in judgment otherwise for Her Highness than for the subject." Fair play—even handed justice—was to be the rule for the future.

Upon what foundation, presumption or assumption, did this rule rest? There seems to have been two grounds: 1, that as the sovereign was a party the subject should not be permitted to impeach or question the testimony offered by this high litigant, by introducing other witnesses; and, 2, that, since the prisoner was on trial for felony, the witnesses would, in view of the fearful consequences, speak the truth, the whole truth and nothing but the truth, as bound by oath to do. But in this there was a terrible mistake, the proposition being unsupported—indeed, in direct conflict with the fact—in a large number of cases. Hence "the greatest legal authorities" pronounced the rule "tyrannical and without foundation in reason or justice." In felonies, other than treason, the prisoner was denied counsel. We are told it was the duty of the judge to examine witnesses for him; to advise him for his benefit, and to assist him in defending himself; taking advantage, also, of every obvious defect or irregularity in the conduct of the prosecution. (1 Chitty's Crim. Law, 623.)

Now, since it was the duty of the judge to act as counselor, friend and advisor of the accused, it was presumed—assumed—that he performed his duty, and bore himself faithfully in this responsible relation. And notwithstanding the absolute fact that, in very many cases, a malignant prosecutor was found in the person of the judge, the silly and unjust presumption remained the same. It was sufficient cause to deny the accused counsel, because the law imposed that duty upon the judge. Was this duty always honestly performed? The blood of hecatombs of innocent victims sacrificed to this monstrous rule furnishes an eternal negative to the assumption.

Now to the analogy: It was the duty of the judge, under the English rule, to represent and protect the interests of the prisoner, and, therefore it was presumed—assumed—that he discharged the duty; hence he was denied counsel. It is the duty of the grand jury, under the California statute, to have before them sufficient evidence, *prima facie*, to convict, before they shall find an indictment; therefore, it is presumed—assumed—that such evidence was in fact before them. I assert that it is

as reasonable to indulge a presumption that the judge performed his duty as that a grand jury did its duty, as imposed by statute. On legal and lay authority we know that the judge too often failed in his duty; and so do we know that grand juries, even though the rights of the accused be protected against hasty and immature findings by a California statute, have failed and do fail of their duty. If the reported cases be taken as a test, there is not one case of ten tried under indictment for capital offense, in which the prisoner is guilty of such offense.

I now take leave of the case made under the California statute, remarking that it has little, if any, application to the case in hand. For, as has been seen, 1, the constitutional provision with reference to bail in that State radically differs from ours, bail not being there allowed if the proof be evident, or the presumption great; and, 2, the law of that State requires that the grand jury shall have before them such evidence as would convict upon final trial for the offense charged in the indictment; and, finally, there is no authority in the practice of that State for using the witnesses, or their testimony, who were before the grand jury on application for bail. In this State the Constitution provides expressly that the provisions relating to the right to bail, "shall not be so construed as to prevent bail after indictment, upon examination of the evidence, in such manner as may be prescribed by law." (Bill of Rights, sec. 11.)

Thus it appears that there may be an "examination of the evidence," notwithstanding the indictment. As to what is meant by "the evidence," there is scarcely need for explanation. Referring again to the California cases, it is asked, if the Constitution confers a right, shall it be rendered nugatory because neither the common law nor the statute provides means for enforcing the right? I concede that the Constitution may confer a right in such manner as that it is inoperative without auxiliary legislation, but I am not aware that in order to give force to the Constitution it is necessary to repeal existing laws which stand in the way of its enforcement. The Constitution, being the organic law, *ex propria vigore*, removes all legislative obstacles to the proper working of its provisions. Several cases have been examined which arise under a constitutional provision that "all prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident or the presumption great;" and the uniform construction given to the latter clause is that "presumption great" is furnished by the finding and

presentment of a grand jury. None, however, go to the extent of holding that either is *proof* of guilt of the offense charged. Referring to the cases on the subject, it will be observed, as a logical result arising from the doctrine that there is a prima facie case raised by the indictment, that the presumption is not made directly from the evidence, but indirectly. From the indictment—not the evidence—it is presumed that there was evidence before the grand jury, of such probative force as to render the guilt of the indicted party *evident*. The judge who tries the right to bail need not pass upon the evidence directly; but he adopts the conclusion of the grand jury, assuming that sufficient evidence was before that body to render the guilt of the prisoner evident; hence this presumption of a prima facie case is not reached in the first instance by the judge, but by the grand jury; and therefore the decision—the judgment—of the grand jury upon the question of proof is practically made the decision of the judge, notwithstanding he is the proper authority to pass upon the applicant's right to bail. Will it be seriously contended that by such a line of argument the guilt of the prisoner can possibly be made evident?

It will be borne in mind that there is no law in this State prescribing the quantum of proof necessary to warrant the grand jury in presenting an indictment, as is the case in California; and hence the presumption that the grand jury obeyed the law does not arise. The only direction is given in the oath to be taken by the members of that body to the effect that they "shall present no person from envy, hatred, or malice; neither shall they leave any person unpresented for love, fear, affection, or hope of reward; but they shall *present things truly as they come to their knowledge, according to the best of their knowledge.*" In this latter portion there is nothing said about the *quantum* of evidence, or the method by which the things to be presented are to be brought to their knowledge. Usually this is done by the examination of witnesses; but in many cases presentments are made upon depositions taken by examining courts, and in other cases upon reports made by individual members of what they have learned from others; and not infrequently the rumors and suspicions among the people are reported and acted upon as sufficient to support the presentment. With these observations, let us proceed with the argument on the degree of presumption arising from the indictment.

Possession of property recently stolen, unexplained, is prima

facie evidence of guilt.   Is it because *the law makes it so?*   By no means.   This presumption rests upon a solid foundation, which is this: That, in the great majority of cases, the party found in possession recently after the theft, without explanation, is in fact the guilty taker.   Possession of personal property is also prima facie evidence of ownership, for the obvious reason that, in a vast majority of cases, the party in possession of such property is in fact the owner.   Let us now apply this simple rule to the presumption under discussion.   We will presume, for the purposes of the argument, that, in a majority of cases preferred by indictment, the grand jury had before them *evident* proof of the guilt of the party charged.   A is indicted for a capital offense; therefore—following out the syllogism—the proof before the grand jury, upon which the indictment was found was *evident.*   Proximately, the conclusion is correct; but there is a lapse in an important link of the chain of premise; for, who that is informed of the actual working of the grand jury system will assert that in a majority or one-half, or even a tenth, of the presentments made under it, the party charged of capital offense was so charged upon *evident* proof of guilt.

To view the matter in another light:   In a great majority of cases, in which a party is indicted for capital offense he is, in fact, guilty of capital offense.   A is indicted for capital offense; therefore, A is guilty of such offense.   The same gap in the premise exists as before; for it may be safely asserted that of five indictments charging capital offense, there is not more than one which the evidence supports.   We remember but very few instances in the judicial history of the State of a grand jury's presenting an indictment for murder of the second degree, or negligent homicide; and bills of indictment charging manslaughter are rare exceptions in the criminal pleading of the State.   The practice is to indict for the highest grade, and the general result is a conviction for a lesser grade.   If, therefore, there is not more than one of five parties actually guilty of capital offense, though thus charged, the correct presumption would be that the chances of guilt were in that ratio.   And, if we are to presume anything at all from the indictment, the logical and just presumption would be that there are four cases of five in which the offense is either less than capital or no offense at all.   On this line of reasoning we are, therefore, to conclude that, in the ratio of four to one, the presumption arising from indictments for capital offense is against the guilt

of the party as charged, and in favor of bail upon the absolute facts.

We now desire to make some observations on the question as to what presumption, if any, may arise from the presentment of an indictment. Bearing upon the duties of officers in whose custody the accused may be, the nature and gravity of the charge is of first importance. And, in passing upon the right to bail and the amount thereof, the character of offense charged should be looked to. This should be done in all cases in connection with the proof looking to the character of the offense charged and the applicant's ability to give bail. But the *right* to give bail in no case, except capital, is to be determined by the strength of the criminating testimony. The nature and gravity of the charge control up to the hearing for bail. Upon the hearing, it is in all cases the nature of the charge, the character of the evidence and the ability of the applicant which control. But the *right* to bail, except in capital cases, depends upon none of these. Before the evidence is developed in any form of hearing, the officer having the accused in custody, or the court, if in session, is governed as to the amount by the character of the charge and the ability of the accused, taking as a guide that the ends of justice are met when the amount fixed renders it reasonably certain that the party bailed will appear and answer. In this there is no presumption of guilt, the court not looking to this, unless required by the prisoner. But when the prisoner, with sufficient sureties, demands bail, to justify its denial it must be shown that he is guilty of capital offense, and his guilt must be made evident. This can only be done by an examination of the evidence. (Vide latter clause Bill of Rights.) In express terms this right to bail is given in capital cases even, unless guilt is made evident *by the proof*. Proof is the effect, the result, of evidence; and without evidence, legal and competent, there can be no proof. When, therefore, the examination is had, for which section 11 of the Bill of Rights provides, presumptions, except such as arise on competent evidence adduced on the hearing for bail, are not to be indulged; because the right to bail in capital cases must be determined *by the evidence;* the right in other cases being clear, irrespective of the evidence. At the common law, indictment for felony, whether capital or not, precluded the accused from a hearing on the facts; consequently, whether guilty or not, his "sureties" were "the four walls of the prison." Under this barbarous

rule, the dungeons of Great Britain held closely immured for years some of the most virtuous men of the kingdom, without trial and without right to demand a hearing.

Admonished by these grievous abuses, may we not reasonably conclude that our Constitution makers meant to depart from the common law practice, with its illogical presumptions of guilt arising from a criminal pleading, and in doing so to guard against its revival by securing in the organic law larger intendments in favor of personal liberty? In this awakened care for the rights of the citizen, the careful framing of our Bill of Rights and great writ of right—the habeas corpus—found its incentive. With these muniments of right to hedge him about, the accused, though steeped to the eyelids in crime and pent in by bars of triple steel, may demand enlargement for inquiry into the causes of his distraint. Upon such inquiry his liberty is not to be *presumed* away by legal fiction springing out of the allegations of an indictment; his right to bail is indefeasible, *save by his own criminal acts*, the verity whereof is to be determined by legal evidence adduced upon the hearing. Evident guilt of capital offense, established in the proceeding, is the sole condition of forfeiture of the right to bail.

What presumptions, then, it is again asked, arise from the indictment? As none arise upon final trial, so do none upon a hearing for bail; for the presumption of innocence follows the accused until his guilt is fixed by legal evidence beyond a reasonable doubt. The officer having the accused in custody should look to the nature of the charge, whether his prisoner be indicted or not, with a view of regulating the care and means to be used for his safe keeping. What presumption he or others may draw from the existence of an indictment can never be a practical matter bearing upon the subject. Whether indicted by a grand jury, charged by complaint or committed by a magistrate, the prisoner's right to a hearing remains the same. And upon the hearing of the evidence his right to bail is determined; determined by the testimony heard, and not by the indictment or the nature of the charge. Presumptions of guilt before hearing for bail may or may not be drawn, for they are comparatively innocuous; but when the hearing begins they must step aside and give way to the evidence. In the Randon case I assented to a doctrine differing from that here expressed; and my responsibility for the opinion filed in that case is equal with that of my learned brother who prepared and read it from the bench. Subsequent and

more extended examination into the reason upon which the rule rests has persuaded me of my error; and, while consistency is much to be desired, the maintenance of it should be secondary to faithfulness of conviction. I am of opinion that the burden was on the State, by competent testimony, to make *evident* the guilt of the prisoner of capital offense.

We now come to consider the appeal upon its merits. Does the evidence make *evident* the proof of guilt of a capital offense? This proof must be made by *competent* evidence adduced upon the hearing for bail; and all illegal testimony brought out, over objection, must be treated here just as though it formed no part of the statement of facts. It appears from the record that one John Alexander, some twenty-five or thirty minutes before the killing, procured of Leonard Eck a pistol of calibre forty-four or forty-five, stating to Eck that he wanted the pistol for Smith, the applicant, and that the pistol was not loaded when procured. In a very short time after this, Alexander carried a forty-five calibre pistol to Petmecky's, seventy-five yards distant from the Raymond House (near which the homicide occured), purchased cartridges and loaded the pistol; this being fifteen or twenty minutes before the shooting. Alexander worked for applicant at the Raymond House, but left soon after the killing and has not been seen since. Immediately after the shooting, applicant handed Sheriff Hornsby, at his request, a forty-five calibre pistol, nickel plated and walnut stocked. The pistol obtained from Eck by Alexander was a forty-four or forty-five calibre six shooter, of Colt's pattern, and was returned the next or second day after the killing by some person not known. The object of this evidence was to show preparation, and hence a cool and deliberate killing. Is applicant connected with Alexander and responsible for his acts? Not by competent, but hearsay evidence. Were the acts and declarations of Alexander of the *res gestæ?* We think not. Was the pistol obtained by Alexander in fact the weapon used by applicant Smith? May have been, but is not shown to have been by such proof as was accessible, if that was the fact. What did Hornsby do with the pistol handed him by Smith? Who returned Eck's pistol? Was Eck's pistol nickel plated and walnut stocked? These are questions pertinent to a proper understanding of this matter. We will not decide whether or not the acts and declarations of Alexander would be admissible in case it should be shown that applicant used the Eck pistol; but we are clear in the opinion that they were not admissible under the facts as presented in this

record. Hence, in passing upon this case these acts and declarations are not considered as part of the evidence.

Before passing upon the right of appellant to bail in this case, we desire to notice a rule established by this and other courts of last resort. It is this: "It is a safe rule, where a malicious homicide is charged, to refuse bail in all cases where a judge would sustain a capital conviction, if pronounced by a jury, on such evidence of guilt as was exhibited to him on the hearing of the application to admit to bail; and, in instances where the evidence of the State is of less efficiency, to admit to bail." (Ex parte Foster, 5 Texas Ct. App., 225; Commonwealth v. Keeper of Prison, 2 Ashm., 227; Hurd on Habeas Corpus, 438; State v. Simmons, 19 Ohio, 139; Ex parte Bryant, 34 Ala., 270.) Before entering upon the discussion of this rule, however, it is to be observed that the right to bail is not determined by a jury, but is to be granted or refused by the judge or court; and, further, that a prisoner is entitled to bail, unless he be guilty of capital offense and the proof of his guilt be made evident. These two propositions are distinctly affirmative in their nature: First, the proof must be *evident* that the offense charged is capital; and, second, the proof must be evident that the prisoner is the perpetrator of such capital offense. Who is to test their verity? The jury? By no means. The judge or court, having the right to bail, is the only tribunal which can determine their truth. What, therefore, has the supposed verdict to do with this matter? With these observations in mind, let us examine the merits of the rule. If a jury, says this rule, were to convict of capital offense upon the evidence adduced upon a given hearing for bail, and the judge would sustain such conviction, then bail should be refused. There is nothing practical in this rule; it is, in fact, misleading. It assumes that the jury will convict of capital offense, in a case in which the proof of guilt of such offense is not *evident*; otherwise there is nothing in the rule. Suppose, in the judgment of the judge hearing the application for bail, the proof is not *evident*, upon what legal intendment could he suppose a jury would convict? If the guilt of the prisoner is not evident to the judge, he can not fairly assume that a jury would convict, unless upon proof less than evident proof. On the other hand, if the proof of guilt is *evident*, there is no need of a *supposed* conviction; the test is not wanted, for the question would be decided before it could be applied. But, two views may, in some cases, with reason be taken of the facts

of a case; one tending to show evident guilt, while in the other guilt may not appear, or may not be evident. Now, we would, in the name of the humane principles of the criminal law, inquire a reason for assuming that a jury would take the harsher view of the case, and not only convict, but convict of capital offense?

As above stated, the judge or court, and not a jury, must decide the right to bail. The applicant has a right to the judgment of the judge upon his application. It will not do for the judge to speculate upon the decision of a jury, and thus substitute a supposed verdict for his judgment; for it is his duty and the applicant's legal right that he, the judge, shall determine the matter. Now, let us suppose that, in the opinion of the judge, the proof is *not evident*, what right has he to engage in suppositions at all? If his judgment favors the granting of bail, his obligation to duty should enforce it, without indulging in speculations as to what a jury might do in the premises.

It may be further said that the rule under discussion contains a serious error, since it assumes that the judge will not sustain the verdict unless the proof is *evident*—evident not alone to *the jury* but to *him*. To deny bail the proof must be evident; hence, the verdict of the jury must be equal to, or rather the result of, evident proof; if it is not, the measure of the Bill of Rights is not met and supplied.

By what rule should the trial judge and this court be governed with regard to verdicts of juries? Referring to the ninth subdivision of Article 777, Code of Criminal Procedure, and the authority of the Supreme Court to reverse the judgment in a criminal action, upon the law or the facts, Chief Justice Roberts, in Talbot v. The State, 44 Texas, 95, says; "These provisions impose upon the district court in the first instance, and afterward upon this court, the responsibility of determining whether or not there has been adduced before the jury a sufficient amount of legal and competent evidence to render it safe to allow the verdict to stand and become a precedent in the adjudication of offenses under the law. The performance of this duty on the part of the court is the exercise of a legal discretion and judgment as to what facts should be sufficient to rebut the legal presumption of innocence to which every one is entitled upon his trial for an offense. * * * There must be legal and competent evidence particularly identifying the defendant with the transaction constituting the offense charged against

him." In this there is nothing said about proof establishing guilt beyond a reasonable doubt, nor anything whatever mentioned regarding evident proof. Evident proof applies to applications for bail; proof beyond reasonable doubt, to jury trials; pertinent proof, identifying the defendant with the transaction constituting the offense charged against him, is the rule which should control the trial judge and this court in passing upon the sufficiency of the evidence to sustain the verdict.

Again, if there be a conflict in the evidence, and that which supports the verdict be reasonable and pertinently connecting the defendant with the transaction which constitutes the offense charged, this court will not reverse, notwithstanding the exculpating evidence may be competent, natural and reasonable. If, however, there is no conflict, but the exculpating facts explain and render consistent with innocence the criminating facts, which, prima facie and without explanation, are sufficient to support the verdict, this court will reverse in cases in which the credibility of the witnesses who testify to the exculpatory facts is not in some way drawn in question. Should these rules apply to and govern the judge, or the court, in passing upon the right to bail? Upon final trial the jury are the judges of the weight of the testimony and the credibility of the witnesses; and when they have performed this duty and rendered a verdict of guilty, this court is loath to disturb their verdict. Let us illustrate this matter: A is upon trial for murder. Quite a number of witnesses swear to facts which, if true, warrant a conviction. On the other hand, an equal number testify to facts which, if true, justify an acquittal. The criminating and exculpating facts are here in conflict. Now, if in this state of case, there should be a conviction, this court would not disturb the verdict. But suppose such a case was presented to the judge, or to this court, on hearing for bail? Could it, with reason, be said that the proof was *evident?* By no means, and the assertion is ventured that all courts of last resort frequently affirm judgments upon a state of facts under which, if called to pass in the first instance, they would have reached a different conclusion.

Now, to be in harmony with the Bill of Rights, in order to constitute the verdict of the jury a just test the rule should require a reversal in cases where the proof is not *evident.* The standard can not be lowered; the prisoner must have bail unless there be such proof. Who will assert that the trial judge, or

the court, must award a new trial, unless the proof of guilt be evident?

From the propositions argued, the following rules for application to this case are deduced: 1, the burden is on the State to establish by evident proof that a capital offense has been committed; 2, that by the same character of proof the prisoner is the guilty perpetrator of such offense; and, 3, that to deny bail the judge, or court, must find both these propositions in the affirmative.

A discussion of the evidence in this case would be improper, premising that two or more theories are presented, each having support in evidence and reason. I do not indicate which theory I think is supported by the weight of the testimony, as well as the more cogent reason. Suffice it to say that there is evidence and some reason to support either. This being the case, the proof is not *evident*. It is not here intimated that bail is to be granted in all cases where the evidence is conflicting. If the criminating facts are so cogent and conclusive as to show that the conflicting evidence, or theory, is *evidently* not true, by reason of mistakes or perjury, etc., bail should be denied.

The views here discussed are concluded with an extract from the opinion of Justice Moore in Ex parte Miller, 41 Texas, 213: "The only question, therefore, which we are called upon to determine, or which it is even proper for us to consider in this case in its present attitude, is, Does it *evidently* appear from the *testimony* submitted *to us* that appellant is guilty of murder in the first degree? If not, although he may be guilty as *charged* in the *indictment*, we have no discretion, but must admit him to bail. And as we are not authorized to analyze and weigh the testimony to ascertain and determine whether it preponderates in favor of or against appellant; nor can we *speculate* as to the *conclusion* to which the *jury* may come if the case was submitted to them on the *evidence* in the *record before us*; and since, whatever may be the conclusion which should be reached by those whose duty it may be to decide it, when appellant's guilt or innocence (or, if guilty, the degree of his guilt) comes to be finally determined, a careful examination of the record does not authorize us, in view of the conflict in the evidence, * * * * to say that the *proof* of his guilt of a capital offense is *evident*, we must hold that he is entitled to bail." The italics are ours, and are used to call special attention to the pointedly pertinent portions of the extract.

For the reasons herein given I am impelled to dissent from the views of the case and the conclusion drawn by my learned brethren of the bench.

Opinion delivered February 16, 1887.